UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC.,       *Plaintiff,* <br><br> *vs.* <br><br> COMMISSIONER, INDIANA STATE DEPART-MENT OF HEALTH, *et al.*,       *Defendants.* | )<br>)<br>)<br>)    1:13-cv-1335-JMS-MJD<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION**

Presently pending before the Court is Plaintiff Planned Parenthood of Indiana and Kentucky, Inc.'s ("PPINK") Motion for Preliminary Injunction. [Dkt. 7.] PPINK asks the Court to enjoin the Defendants Commissioner, Indiana State Department of Health, and Prosecutor, Tippecanoe County (collectively, the "State") from enforcing Indiana Code §§ 16-18-2-1.5(a)(2) and 16-21-2-2.5(b), contending that those statutes violate various provisions of the federal Constitution as applied to a clinic that PPINK operates in Lafayette (the "Lafayette clinic"). It is undisputed that the Lafayette clinic provides medication abortions and does not provide surgical abortions. Pursuant to the statutes at issue, however, in order for the Lafayette clinic to continue to provide medication abortions after January 1, 2014, PPINK must modify the Lafayette clinic to comply with certain surgical facility physical plant requirements, despite the fact that the Lafayette clinic does not perform surgical abortions.

PPINK asserts three constitutional challenges to the two statutes at issue, but the Court concludes that PPINK has only shown a reasonable likelihood of success at this stage of the proceedings on its equal protection claim regarding Indiana Code § 16-18-2-1.5(a)(2). That statute divides medication abortion providers into two groups—"abortion clinics" and "physician's of-

fices"—and then treats those groups differently by requiring abortion clinics, but not physician's offices, to meet physical plant requirements that previously only applied to surgical abortion facilities.  The State has not presented a rational basis for distinguishing between medication abortion providers in this way, particularly when considering the statutory ambiguity between the terms "abortion clinic" and "physician's office."  Accordingly, for reasons discussed further below and in light of the Court's balancing of the other applicable factors, the Court issues a preliminary injunction enjoining the State from enforcing Indiana Code § 16-18-2-1.5(a)(2) with regard to PPINK's Lafayette clinic.  The Court denies PPINK's request for a preliminary injunction on the waiver prohibition contained in Indiana Code § 16-21-2-2.5(b).

## I.
### APPLICABLE LAW

To obtain a preliminary injunction, "the moving party must demonstrate a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction."  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012), *cert. denied*.  If the movant makes this threshold showing, the Court "weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest."  *Id.*  The strength of the moving party's likelihood of success on the merits affects the balance of harms because "[t]he more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor."  *Id.*

## II.
### BACKGROUND

The parties stipulated to the admissibility of the evidence presented in support and oppo-

sition of the pending motion.  [Dkt. 45.]  The following facts are undisputed, unless otherwise

noted.

### A.   Relevant Statutory Framework

The Indiana State Department of Health ("IDOH") licenses and regulates hospitals, am-

bulatory outpatient surgical centers, birthing centers, and abortion clinics.  Ind. Code § 16-21-2-

2.  Before July 1, 2013, an "abortion clinic" was defined as "a freestanding entity that . . . per-

forms surgical abortion procedures."  I.C. § 16-18-2-1.5.  On July 1, 2013, an amended statute

went into effect and provides that beginning January 1, 2014, a freestanding entity that "provides

an abortion inducing drug for the purpose of inducing an abortion" will also be considered an

abortion clinic.  I.C. § 16-18-2-1.5(a)(2).  The definition of "abortion clinic" does not include a

"physician's office as long as . . . abortion inducing drugs are not the primarily dispensed or pre-

scribed drug at the physician's office."  I.C. § 16-18-2-1.5(b)(3)(B).  The term "physician's of-

fice" is not defined in the relevant statutory provisions, as both parties noted during oral argu-

ment on the pending motion.

Under Indiana Code § 16-21-2-2.5(a), the IDOH may establish minimum license qualifi-

cations for birthing centers and abortion clinics, as well as sanitation standards, staff qualifica-

tions, necessary emergency equipment, procedures to provide emergency care, and quality assur-

ance standards.  Physical plant specifications have been established for abortion clinics.  410

I.A.C. 26-17-2.  Among other things, an abortion clinic must have procedure rooms that are at

least 120 square feet in size, a hand washing station in each procedure room, scrub facilities near

the entrance of the procedure rooms, a separate recovery room or area, and a toilet room contain-

ing a lavatory for hand washing that is accessible from all examination and procedure rooms. 410 I.A.C. 26-17-2(d).  Additionally, there must be an emergency call system in the procedure and recovery areas.  410 I.A.C. 26-13-3(b)(1).

Pursuant to Indiana Code § 16-21-1-7, the IDOH adopts, modifies, remands, or rejects rules "necessary to protect the health, safety, rights, and welfare of patients" pertaining to "the operation and management of hospitals, ambulatory outpatient surgical centers, abortion clinics, and birthing centers."  The IDOH may "waive a rule" for good cause shown, but the "waiver may not adversely affect the health, safety, and welfare of the residents or patients."  I.C. § 16-21-1-9.  Pursuant to a statutory amendment effective July 1, 2013, the IDOH "may not exempt an abortion clinic from the requirements . . . including physical plant requirements."  I.C. § 16-21-2-2.5(b).  That provision "applies to a person applying for a license as an abortion clinic after December 31, 2013."  I.C. § 16-21-2-2.5(b).  A person who knowingly or intentionally operates an unlicensed abortion clinic commits a Class A misdemeanor.  I.C. § 16-21-2-2.5(c).  Additionally, the Indiana Attorney General may seek an injunction or relief that includes a civil penalty not to exceed $25,000 for each day of unlicensed operation.  I.C. § 16-21-5-1.

### B. PPINK's Lafayette Clinic

PPINK operates 26 health centers and an administrative office in Indiana.  [Dkt. 26-1 at 1.]  Its health centers provide medical services, including Pap tests, cancer screenings, sexually transmitted disease testing and treatment, self-examination instructions, and a variety of birth control options.  [*Id.*]  Currently, PPINK clinics in Indianapolis, Bloomington, and Merrillville provide first trimester surgical and non-surgical abortions.  [*Id.* at 1-2.]  Non-surgical abortions are also referred to as medication abortions.  [*Id.* at 2.]

PPINK's Lafayette clinic does not provide surgical abortions or perform any other surgical procedures, [*id.*; dkt. 26-2 at 5], but it does provide medication abortions, [dkts. 26-1 at 2; 26-2 at 5].  The Lafayette clinic has a part-time physician and is also staffed by an advanced practice nurse.  [Dkt. 26-1 at 2.]  The Lafayette clinic began providing medication abortions in August 2010.  [*Id.* at 4.]  It only offers medication abortions when its physician is at the clinic.  [Dkt. 26-2 at 2.]  Its physician is qualified under state and federal law to prescribe the medication to induce a non-surgical abortion.  [*Id.* at 4.]

Medication abortions are available to PPINK patients up to 63 days after the first day of the woman's last menstrual period.[1]  [Dkt. 26-2 at 2.]  PPINK uses the following protocol for a medication abortion:

- Eighteen hours after meeting with a physician or advanced nurse practitioner, the woman receives information required by state law;

- Medical history and vital signs are taken;

- An ultrasound and lab testing are performed;

- A physician prescribes and dispenses the medication mifepristone (sometimes known as RU-486), which the woman takes in pill form at the clinic.  Mifepristone works by blocking the hormone progesterone, which is needed to maintain a pregnancy.

- The woman is given written instructions and four misoprostol pills, which she is instructed to take in 24-48 hours by placing the pills between her cheeks and gums.  The woman is not instructed to return to the clinic to take the misoprostol but, instead, is instructed to take it at a location of her choosing.

---

[1] PPINK acknowledges that the label for one of the medications it utilizes to perform a medication abortion only discusses use of that medication through 49 days following the first day of the woman's last menstrual period.  [Dkt. 44-2 at 5.]  PPINK's "off label" use, which it asserts is "the most common medication abortion protocol used in the United States," [dkt. 46-1 at 6 ¶ 15], is not at issue in this lawsuit.

- The woman is given an appointment to return in approximately two weeks for an ultrasound to verify that the pregnancy has been terminated. Alternatively, a blood draw can occur at the clinic and a prescription can be written for a second blood draw two weeks later at a place of the woman's choosing to measure the change in hCG levels, which is the hormone produced by the placenta.

- The woman is given an antibiotic to assist in the prevention of infection and also receives a prescription for pain and nausea reducing medications.

- The woman is informed both orally and in writing about potential side effects from the medications. She is told to expect cramping and bleeding after taking the misoprostol and that in the event of serious side effects such as heavy bleeding or fever, she can call the clinic or PPINK's 24-hour emergency number.

- If the medication abortion is not complete, the woman may elect to take a second dose of misoprostol, have a surgical abortion at a clinic that offers that procedure, or do nothing.[2]

[Dkts. 26-2 at 2-3; 35-1 at 6.]

The Lafayette clinic saw more than 4,000 unduplicated patients in the twelve months before July 1, 2013. [Dkt. 26-1 at 4.] During that time period, 54 women had medication abortions and more than 10,000 other medications—primarily contraceptives—were dispensed or prescribed at the Lafayette clinic. [*Id.*; dkt. 26-2 at 5.] PPINK files a "Terminated Pregnancy Report" with the IDOH after every abortion it provides. [Dkt. 26-1 at 4.] The report requires, among other things, that complications be listed. [*Id.*] The report includes various categories of complications, including hemorrhage, infection, retained products of conception, uterine perforation, cervical laceration, maternal death, and "other (specify)." [*Id.* at 4, 7.]

---

[2] PPINK contends that in 2-5% of medication abortions, some tissue is retained in the uterus, typically causing continued bleeding or spotting. [Dkt. 35-1 at 6.] Within that 2-5%, PPINK contends that approximately 0.5% of women who take the medicine for a medication abortion will not only have retained tissue but also a continued pregnancy. [*Id.*] If a woman desires a surgical abortion after an unsuccessful medication abortion at the Lafayette clinic, the surgical abortion will be performed at one of PPINK's other clinics that offer that procedure, not at the Lafayette clinic. [Dkt. 44-1 at 2.]

Each party has submitted a report from an expert supporting its position regarding medical complications that can occur after a medication abortion. [Dkts. 26-3 (PPINK's expert report contending that adverse events following medication abortions are "exceedingly rare"); 37-1 (the State's expert report detailing the risk of medication abortions, contending that "heavier bleeding and more severe cramping are more common in medication abortions [than surgical abortions]"). While the parties dispute the frequency and severity of potential complications from medication abortions, they do not dispute that complications can occur. Moreover, the State does not dispute PPINK's assertion that any complications will occur after the woman has taken the mifepristone and left the clinic. The parties also do not dispute that although complications from medication abortions were reported at some of PPINK's clinics, the Lafayette clinic did not report any complications for the 54 patients who received a medication abortion at that facility in the twelve months before July 1, 2013. [Dkts. 26-1 at 4-5; 37-5 at 1-6; 38 at 1 (parties' stipulation regarding accuracy and authenticity of dkt. 37-5 for purposes of pending motion).]

According to PPINK's President and CEO, Betty Cockrum, PPINK's Lafayette clinic is the only location in Indiana that offers non-surgical abortions but not surgical abortions.[3] [Dkt. 26-1 at 1-2.] When the Indiana General Assembly was considering expanding the definition of "abortion clinic" in Indiana Code § 16-18-2-1.5 to include freestanding entities that provided medication abortions, Ms. Cockrum attests that PPINK "pointed out to legislators that this would result in PPINK's Lafayette center having to meet surgical abortion requirements even though no surgical abortions, or any other surgical procedures, are provided there."[4] [Id. at 2.]

---

[3] The State confirmed at oral argument that there is no evidence in the record of any other facilities in Indiana offering medication abortions but not surgical abortions.

[4] Ms. Cockrum's affidavit is unclear how the proposed statute's applicability to the Lafayette clinic was "pointed out" to the legislators, but the State does not contest her testimony.

PPINK rents the facility where the Lafayette clinic is located.  [*Id.* at 3.]  The Lafayette clinic contains a waiting room, a reception area, four examination rooms, a staff break room, four offices, a medicine storage area, a lab area, and two restrooms (one reserved for staff and one available for use by patients and those in the reception area).  [*Id.*]  As currently designed, the Lafayette clinic does not contain scrub facilities, a recovery room, or an emergency call system, which it contends are necessary for it to meet the requirements of an "abortion clinic" under the applicable regulations.  [Dkt. 26-1 at 3.]

On July 15, 2013, PPINK submitted an abortion clinic licensing application to the IDOH for the Lafayette clinic and requested that the physical plant requirements it contended were only applicable to surgical procedures be waived for the Lafayette clinic because it does not perform surgical abortions or surgical procedures.  [Dkt. 1-1.]

### C.  Procedural History

On August 22, 2013, PPINK sued the Commissioner of the IDOH and the Tippecanoe County Prosecutor, asking for declaratory and injunctive relief from the challenged Indiana statutes.  [Dkt. 1 (challenging the constitutionality of Indiana Code § 16-18-2-1.5(a) (definition of "abortion clinic") and § 16-21-2-2.5(b) (forbidding the IDOH from exempting an abortion clinic from, among other things, the physical plant requirements)).]  PPINK alleges that requiring a facility that only offers non-surgical abortions to meet the requirements of surgical abortion centers is not reasonably related to increasing patient safety and is not medically necessary.  [Dkt. 1 at 11.]  PPINK asserts that the challenged statutes violate its equal protection rights, its substantive due process rights, and constitute an unreasonable regulation of medicine in violation of its patients' privacy rights under the Fourteenth Amendment to the United States Constitution.  [*Id.* at 12-13.]

PPINK filed a Motion for Preliminary Injunction on August 27, 2013. [Dkt. 7.] The Court held a hearing on that motion on October 30, 2013, and took the matter under advisement. [Dkt. 48.] The State confirmed at oral argument that it had not yet ruled on PPINK's abortion clinic application or waiver request.

After oral argument, the Court ordered the State to provide a status report regarding the status of PPINK's abortion clinic application and waiver requests. [Dkt. 49.] On November 13, 2013, the State filed a report notifying the Court that the IDOH intended to issue documents formally denying PPINK's abortion clinic application and waiver requests within a few days. [Dkt. 50 at 3.] Specifically, the State reported that PPINK's Lafayette clinic would "qualify as an 'abortion clinic'" as of January 1, 2014, because it administers abortion inducing drugs. [*Id.*] The State further reported that the IDOH interprets Indiana Code § 16-21-2-2.5(b) "to mean that every person who applies for a license to operate an abortion clinic for a period that will include all or some part of 'after December 31, 2013' must comply with all abortion clinic requirements, without exemption or waiver of any kind." [*Id.* at 2.] Therefore, because PPINK conceded in this litigation that its Lafayette clinic does not comply with the physical plant requirements of 410 I.A.C. 26-17-2 and the IDOH could not exempt it from those requirements under § 16-21-2-2.5(b), the IDOH would deny PPINK's application and waiver request for the Lafayette clinic. [*Id.* at 3.] On November 14, 2013, the IDOH issued a Notice of License Application Denial and Denial of Waiver Requests regarding PPINK's Lafayette clinic. [Dkt. 52-1.] The Court, therefore, finds the matter ripe for adjudication.

## III.
### DISCUSSION

PPINK challenges the constitutionality of Indiana Code §§ 16-18-2-1.5(a)(2) (definition of "abortion clinic") and 16-21-2-2.5(b) (waiver prohibition for physical plant requirements for

abortion clinics) and requests that this Court enter a preliminary injunction, without bond, preventing the enforcement of these statutes with regard to PPINK's Lafayette clinic. [Dkt. 29 at 2, 13-24.] PPINK asserts that these statutes violate its equal protection rights, its substantive due process rights, and constitute an unreasonable regulation of medicine in violation of its patients' privacy rights under the Fourteenth Amendment to the United States Constitution. [*Id.*; dkt. 1 at 12-13.] It further contends that the balance of factors at issue supports the Court entering a preliminary injunction in its favor on the challenged statutes. [Dkts. 29 at 22-23; 44 at 19-20.] The State opposes PPINK's claims and its request for injunctive relief. [Dkt. 42.]

### A. Reasonable Likelihood of Success on the Merits

#### 1. Equal Protection Claim

PPINK asserts that each of the challenged statutes violates its rights under the Equal Protection Clause of the Fourteenth Amendment. [Dkt. 29 at 17-18.] The Court will separately address PPINK's challenge to each statute.

#### a) *"Abortion Clinic" Definition Excepting "Physician's Office"*

PPINK contends that Indiana Code § 16-18-2-1.5 violates its rights under the Equal Protection Clause because the statute defines "abortion clinic" to create two groups of medication abortion providers—"abortion clinics" and "physician's offices"—and then treats those groups differently. [Dkts. 29 at 18, 20; 44 at 15-18.] PPINK concedes that its equal protection claim is subject to rational basis review, but argues that the State has no rational basis to support the different treatment the statute gives to abortion clinics and physician's offices. [*Id.*]

The State cites precedent that it contends approves of treating "abortion providers differently from other health professionals." [Dkt. 42 at 32.] It argues that the Indiana legislature "might have reasonably concluded that a physician's office should be treated differently from an

abortion clinic because abortions are even rarer and physicians' offices are more appropriately governed by a board of physicians' peers." [*Id.* at 33.] Even if a physician's office provides medication abortions at the same rate that the Lafayette clinic does, the State argues that it is allowed to impose health and safety regulations "one step at a time," choosing first to apply them to abortion clinics. [*Id.* at 35.] For these reasons, the State contends that the statutory exception for physician's offices that provide medication abortions has a rational basis.

On reply, PPINK points out that its physician is, of course, also subject to the exact same rules and standards adopted by the Medical Licensing Board. [Dkt. 44 at 15 (citing Ind. Code § 25-22.5-2-7).] It argues that the State cannot circumvent rational basis review by regulating "one step at a time" to justify "the differential treatment of entities providing the exact same service." [Dkt. 44 at 16-18.]

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws, which essentially is a direction that all persons similarly situated should be treated alike." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (citation omitted). "It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless the classification rests on grounds wholly irrelevant to the achievement of any legitimate governmental objective." *Harris v. McRae*, 448 U.S. 297, 322, 326 (1980) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). "All equal protection claims, regardless of the size of the disadvantaged class, are based on the principle that, under like circumstances and conditions, people must be treated alike, unless there is a rational reason for treating them differently." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010).

- 11 -

It is not disputed that as of January 1, 2014, Indiana Code § 16-18-2-1.5 divides medication abortion providers into two groups—"abortion clinics" and "physician's offices"—and treats those groups differently.  Indiana Code § 16-18-2-1.5(a)(2) defines the term "abortion clinic" to include any freestanding entity that "provides an abortion inducing drug for the purpose of inducing an abortion."  The statute excepts a "physician's office" from the definition of "abortion clinic," as long as abortion inducing drugs "are not the primarily dispensed or prescribed drug at the physician's office."  I.C. § 16-18-2-1.5(b)(3)(B).  The effect of this distinction is not meaningless.  As of January 1, 2014, a medication abortion provider deemed an "abortion clinic" must abide by the physical plant requirements that previously only applied to entities performing surgical abortions.  *See, e.g.*, 410 I.A.C. 26-17-2; 410 I.A.C. 26-17-2(d); 410 I.A.C. 26-13-3(b)(1).  But a medication abortion provider deemed a "physician's office" need not meet those physical plant requirements because the statute excepts it from the definition of "abortion clinic."  I.C. § 16-18-2-1.5(b)(3).

The State has confirmed that as of January 1, 2014, it will consider PPINK's Lafayette clinic to qualify as an "abortion clinic" because it "administers abortion inducing drugs."  [Dkt. 50 at 3.]  But because PPINK has conceded that the Lafayette clinic does not meet certain physical plant requirements that previously only applied to surgical abortion providers, the IDOH has

- 12 -

denied PPINK's abortion clinic application.[5]  [Dkts. 50; 52-1.]  Thus, as it currently stands, the Lafayette clinic will no longer be able to perform medication abortions after January 1, 2014, while medication abortion providers deemed "physician's offices" can continue to perform medication abortions without meeting the physical plant requirements at issue.

The State argues that in light of the health risks associated with medication abortions, "it was reasonable for the Indiana legislature to conclude that it could further women's health if medication abortion providers themselves were prepared to provide some measure of surgical or other emergency intervention."  [Dkt. 42 at 23.]  The State cites United States Supreme Court precedent that confirms that it can impose requirements on abortion providers that "significantly differ from those imposed with respect to other, and comparable, medical or surgical procedures."  [Dkt. 42 at 32 (citing *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 80-81 (1976)).]  There are two problems with the State's argument.  First, if the State believes that women who receive medication abortions should have the potential for follow up surgical care at the location where they received the medication, that concern applies equally at an abortion clinic or a physician's office.  Second, the statute in question does not distinguish among abortion and other procedures.  Instead, the statutory distinction between "abortion clinics" and "physician's offices" in Indiana Code § 16-18-2-1.5 distinguishes only among abortion providers

---

[5] It is undisputed that PPINK's Lafayette clinic does not provide surgical abortions or any other surgical procedures, but the IDOH interprets § 16-21-2-2.5(b) as prohibiting it from granting a waiver of the surgical physical plant requirements that the Lafayette clinic does not meet.  [Dkt. 50 at 2.]  In Indiana, "[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless [its] interpretation would be inconsistent with the statute itself."  *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000).  PPINK has contended from the outset that the temporal limitation on the waiver prohibition for abortion clinic physical plant requirements in § 16-21-2-2.5(b)—"after December 31, 2013"—is "unclear."  [Dkt. 29 at 21 n.9 (setting forth two possible interpretations).]  The IDOH has adopted one of PPINK's proposed interpretations and there is no argument that the interpretation is inconsistent with the statute itself.  Thus, the Court will defer to the IDOH's interpretation for purposes of this ruling.

- 13 -

providing the exact same type of abortion.  In other words, the statute divides medication abortion providers performing the same procedure into two groups ("abortion clinics" and "physician's offices") and treats those groups differently.  While *Danforth* contemplates the State's ability to regulate abortion providers differently from those providing "*other*, and *comparable*, medical or surgical procedures," 428 U.S. at 80-81 (emphases added), it does not authorize unequal treatment between abortion providers providing the same abortion-inducing procedure.  *See also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 988 (7th Cir. 2012) ("As these cases make clear, the government need not be neutral between abortion providers *and other medical providers* . . . . As long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently.") (emphasis added).

The State's "one step at a time" argument fails for similar reasons.  [Dkt. 42 at 35.]  The State argues that "even where a physician's office might be providing the same number of medication abortions as a [PPINK] clinic, a legislature could reasonably undertake this 'health and safety' regulation 'one step at a time.'"  [*Id.* (citing *Maguire v. Thompson*, 957 F.2d 374, 378 (7th Cir. 1992)).]  But *Maguire* and the precedent on which it relies do not support a legislature's unequal treatment of those providing the exact same service.  *See Maguire*, 957 F.2d at 377 (upholding legislation requiring persons holding only a degree in naprapathy (a therapeutic system of drugless treatment by manipulation) to gain further education in an approved medical field before they are eligible for state licensure); *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 489 (1955) (upholding requirement prohibiting certain types of advertisement by opticians but exempting sellers of ready-to-wear glasses from that prohibition).

- 14 -

Although the State may be able to regulate the health and safety of the medical profession one step at a time, that is not what Indiana Code § 16-18-2-1.5 does. This is particularly true when the statutory ambiguity between "abortion clinic" and "physician's office" is considered. Both parties confirmed at oral argument that the term "physician's office" is not defined in § 16-18-2-1.5 or other relevant provisions.[6] Thus, under the plain text of the statute, the same entity will be an "abortion clinic" if it prescribes any abortion inducing drugs after January 1, 2014, I.C. § 16-18-2-1.5(a)(2), but also a "physician's office" if abortion inducing drugs are not the primarily dispensed or prescribed drug. The Lafayette clinic is an example of this ambiguity, and is apparently the only example. If that clinic continues to prescribe abortion inducing drugs at its current rate, after January 1, 2014, it could either be an "abortion clinic" (because it "provides an abortion inducing drug for the purpose of inducing an abortion," I.C. § 16-18-2-1.5(a)(2), or a "physician's office" (because "abortion inducing drugs are not the primarily dispensed or prescribed drug at the physician's office," I.C. § 16-18-1.5(b)(3)(B)).[7] [Dkts. 26-2 at 5 (during the 12 months preceding July 1, 2013, 54 out of 10,000 prescriptions at the Lafayette clinic were for medication abortions).] The State has confirmed, however, that it will consider the Lafayette clinic to be part of the "abortion clinic" group of medication abortion providers and, thus, subject to the physical plant requirements at issue. [Dkt. 50 at 3.] PPINK has never sought relief on the basis that it should actually be considered a "physician's office" not subject

---

[6] Likewise, the Court was unable to find, and the parties did not direct it to, a definition of "freestanding entity" used in reference to the term "abortion clinic" in the statute. I.C. § 16-18-2-1.5(a).

[7] This distinguishes the case at bar from *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001), which the State cites to support excluding physician's offices from abortion clinic regulations. [Dkt. 42 at 36.] The Texas statute at issue in *Bell* set a "300-abortion floor as an accommodation to private physicians who provide a number of abortions that the government considers to be too few to require licensing." 248 F.3d at 419. The Indiana statute sets no such floor and, again, does not define the term "physician's office." I.C. § 16-18-2-1.5.

to the physical plant requirements at issue, and the Court will not *sua sponte* afford a party relief that it has not requested.  *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. . . .  Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

In an attempt to support the statutory distinction between medication abortion providers at "abortion clinics" and "physician's offices," the State contends that the Indiana legislature "might have reasonably concluded that a physician's office should be treated differently from an abortion clinic because abortions are even rarer and physicians' offices are more appropriately governed by a board of physicians' peers."  [Dkt. 42 at 33.]  The State has provided no evidentiary support for its theory that medication abortions might be less frequent at physician's offices or that medical practitioners at abortion clinics are regulated differently.  In fact, as PPINK points out in its reply, the Indiana Medical Licensing Board is responsible for ensuring the qualifications and licensure of all medical practitioners in Indiana, which undisputedly include those at PPINK's Lafayette clinic.  I.C. §§ 25-22.5-2-7; 25-22.5-1-1.1.  Moreover, the lack of a rational basis for the distinction between "abortion clinics" and "physician's offices" is even more apparent when considering the statutory ambiguity of those terms, as described above.

For these reasons, the Court concludes that PPINK has shown a reasonable likelihood of success on its equal protection claim.  In sum, the case law cited by the State contemplates the State's ability to regulate abortion providers differently from those providing "other, and comparable, medical or surgical procedures."  *Danforth*, 428 U.S. at 80-81.  But that is not what the challenged statute does.  Indiana Code § 16-18-2-1.5 divides medication abortion providers

providing the same abortion procedure into two groups—"abortion clinics" and undefined "physician's offices"—and then treats those groups differently by requiring abortion clinics, but not physician's offices, to meet the physical plant requirements at issue.  The State has not presented a rational basis for this distinction, particularly when considering the ambiguity between the terms in the statute at issue.  The record evidence establishes that legislators were made aware of the effect of singling out PPINK Lafayette when they passed the statute, and a fair inference is that the legislature intended to target PPINK and its Lafayette clinic.  Accordingly, the Court concludes that PPINK has made a strong showing that it is likely to succeed on the merits of its equal protection claim challenging Indiana Code § 16-18-2-1.5(a)(2), as that statute is applied to the Lafayette clinic.

### b) Prohibition on Waiving Physical Plant Requirements for Abortion Clinics

PPINK contends that Indiana Code § 16-21-2-2.5(b) violates the Equal Protection Clause to the extent that it prohibits the IDOH from waiving physical plant requirements for abortion clinics that would not harm patient safety.  [Dkt. 29 at 21-22.]  PPINK points out that Indiana Code § 16-21-1-9 already provides that a "waiver may not adversely affect the health, safety, and welfare of the residents or patients."  Thus, PPINK argues that "the only waivers that [§ 16-21-2-2.5(b)] bars for abortion clinics are those that do not harm patient safety."  [*Id.*]

The State responds that the Indiana Legislature's decision to "allow waivers for some medical facilities but not abortion clinics advances its objective of protecting women who receive abortions."  [Dkt. 42 at 36.]  It points out that PPINK "does not allege—nor could it—that abortion restrictions are constitutional only if a state agency may waive those restrictions."  [*Id.* at 37.]

- 17 -

Indiana Code § 16-21-2-2.5 provides authority for the IDOH to adopt rules for "birthing centers and abortion clinics."  A "birthing center" is defined as "a freestanding entity that has the sole purpose of delivering a normal or uncomplicated pregnancy."  I.C. § 16-18-2-36.5.  The definition of "abortion clinic" is detailed at length in the previous section, but in relevant part, defines that term as of January 1, 2014 to include a freestanding entity that "provides an abortion inducing drug for the purpose of inducing an abortion."  I.C. § 16-18-2-1.5(a)(2).  Indiana Code § 16-21-2-2.5(b), which PPINK challenges as an equal protection violation, provides that the IDOH "may not exempt an abortion clinic from the requirements described in subsection (a) or the licensure requirements set forth in an administrative rule, including physical plant requirements."  Because that waiver prohibition only applies to abortion clinics, the IDOH could still exempt birthing centers from those requirements under Indiana Code § 16-21-1-9.

The parties spend significantly less time addressing this portion of PPINK's equal protection claim, and the Court finds it appropriate to do the same.  Most importantly, PPINK fails to adequately address why it is unconstitutional for the Indiana Legislature to allow the IDOH to retain the authority to waive requirements for a birthing center but to expressly prohibit waivers for abortion clinics.  Even if this is a "targeted regulation" of abortion clinics, as PPINK claims, [dkt. 44 at 19], the Supreme Court has confirmed the State's ability to regulate abortion providers differently from those providing "other, and comparable, medical or surgical procedures[,]" *Danforth*, 428 U.S. at 80-81; *see also Planned Parenthood of Ind.*, 699 F.3d at 988 ("As these cases make clear, the government need not be neutral between abortion providers and other medical providers . . .  the government is free to treat abortion providers differently.").

Unlike the dubious distinction between medication abortion providers at "abortion clinics" and at undefined "physician's offices" addressed at length above, abortion clinics and birth-

ing centers serve different purposes and provide different procedures.  Accordingly, pursuant to binding legal precedent, they can be regulated differently.  PPINK does not convincingly argue why such regulatory differences cannot constitutionally extend to waivers.  Thus, the Court finds that PPINK has not shown a reasonable likelihood of success on the merits of its equal protection claim regarding the waiver prohibition set forth in Indiana Code § 16-21-2-2.5(b).

2.  <u>Substantive Due Process Claim</u>

PPINK argues that the challenged statutes violate its substantive due process rights. [Dkt. 29 at 16.]  PPINK concedes that "substantive due process is 'a modest limitation that prohibits government action only when it is random and irrational.'"  [*Id.* (quoting *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008)).]  PPINK contends that "while it may be rational to require that a surgical provider have recovery and surgical procedure rooms and scrub facilities, it is perfectly irrational to impose those requirements on facilities, like the Lafayette clinic, that do not engage in surgical abortions or any surgical procedures."  [Dkt. 29 at 17.]

The State responds that PPINK has not identified the substantive due process interest it seeks to defend, speculating that it "evidently seeks to vindicate the novel right to dispense medication."  [Dkt. 42 at 28.]  The State further contends that it has a wide leeway to regulate the practice of medicine and argues that it has a legitimate interest in fostering a continuity of care for women seeking medication abortions.  [*Id.* at 28-31.]

PPINK replies that the State's continuity of care argument is irrational because it is undisputed that any complications from a medication abortion will occur after the woman has left the Lafayette clinic and the woman need not return to that clinic for follow up.  [Dkt. 44 at 13.] Moreover, PPINK contends that it is not rational to require a medication abortion provider to

meet the surgical-based physical plant requirements because the Lafayette clinic does not perform surgical abortions and, thus, would have to refer the woman to another facility if that procedure was necessary to deal with a complication.  [*Id.* at 13-14.]

"[N]o abstract right to substantive due process exists under the Constitution." *Gen. Auto*, 526 F.3d at 1002; *see also National Paint & Coatings Assoc. v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995) ("[W]e have spent some time looking through the Constitution for the Substantive Due Process Clause without finding it.... The fact that [substantive due process] is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use.").  "[O]nly state action that impinges on fundamental rights is subject to evaluation under substantive due process." *Idris v. City of Chicago, Ill.*, 552 F.3d 564, 566 (7th Cir. 2009).  Thus, substantive due process analysis "must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires [the Court] to exercise the utmost care whenever [it is] asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993).  "[T]he lack of a protected property interest is fatal to a substantive due process claim." *Gen. Auto*, 526 F.3d at 1002.

The State's first argument in response to PPINK's substantive due process claim is that PPINK does not identify which interest it seeks to vindicate through substantive due process, speculating that it could be the "novel right to dispense medication." [Dkt. 42 at 27-28.]  PPINK completely ignores the State's argument in its reply, instead jumping right to the alleged irrationality of the State's continuity of care argument.  [Dkt. 44 at 12-14.]  In doing so, PPINK does not dispute the State's assertion that the right to dispense medication, if that is what PPINK seeks to defend, would be novel.  [*Id.*]  The Court will not make assumptions about which substantive due process right PPINK seeks to defend.  Because PPINK has not carefully described its assert-

ed right, the Court concludes that PPINK has not shown a reasonable likelihood of success on the merits of its substantive due process claim.

### 3.   Fourteenth Amendment Claim on Behalf of Patients

PPINK asserts a claim on behalf of its patients, arguing that the legislation at issue violates a woman's Fourteenth Amendment right to privacy. [Dkt. 29 at 13.] PPINK argues that the State has not established a reasonable relationship between the challenged regulations and its interest in maternal health. [*Id.* at 14-16.] Specifically, PPINK contends that it is likely to prevail on this claim because the State "cannot prove that imposing regulations designed specifically for surgical providers on facilities that perform no surgery is medically reasonable." [*Id.* at 15.]

In response, the State first argues that PPINK lacks standing to challenge the regulations at issue on behalf of its patients because "there is an unquestionable conflict of interest between the providers and consumers of abortion services." [Dkt. 42 at 11.] The State distinguishes the case at bar from cases finding the nature of the confidential relationship between doctors and patients sufficient for standing because in this case "[a]bortion providers will understandably oppose any law with compliance costs, but potential patients stand to benefit from new rules requiring, for example, recovery rooms and sanitation equipment." [*Id.*] The State further argues that even if PPINK has standing to assert a claim based on its patients' rights, it cannot invoke a third-party action against the State under 42 U.S.C. § 1983 or the Declaratory Judgment Act because those statutes contemplate the party asserting the claim to be either the party injured or an interested party. [*Id.* at 12-15.] In response to PPINK's argument on the merits, the State argues that the challenged regulations further the State's valid interest in protecting the health of women who undergo medication abortions and that the regulations do not have the purpose or effect of putting a substantial obstacle in the path of a woman seeking an abortion. [*Id.* at 15-16.] The

State emphasizes that PPINK does not provide evidence showing that the statutes have the effect of producing a substantial obstacle to obtaining an abortion and, moreover, that the rational basis of the statutes furthers the State's valid goal to protect the health of women who undergo medication abortion and to facilitate continuity of care.  [*Id.* at 17-26.]

In its reply, PPINK contends that it has standing to bring a third-party claim on behalf of its patients under § 1983, citing abortion jurisprudence regarding that right.  [Dkt. 44 at 5-9 (collecting cases).]  On the merits of its claim, PPINK again asserts that the State has a burden to show that the challenged regulations are necessary to protect maternal health.  [*Id.* at 9-11.]  It argues that the State cannot do so with regard to the Lafayette clinic because that clinic does not perform surgical abortions, thus, the regulations are not medically reasonable.  [*Id.* at 11-12.]

The Seventh Circuit has held in the context of physicians representing patients' rights in challenging a partial birth abortion ban that "[t]he standing of the physician plaintiffs, and of Planned Parenthood as the owner of the abortion clinics [at issue], to maintain this suit is not open to question."  *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998) (Posner, J.); *see also Karlin v. Foust*, 188 F.3d 446, 457 n.5 (7th Cir. 1999) ("Plaintiffs, as physicians and abortion facilities, have standing to bring this suit under [United States Supreme Court precedent].") (citation omitted).  Here, the State attempts to distinguish this binding precedent by emphasizing what it believes to be "an unquestionable conflict of interest between the providers and consumers of abortion services" in this case, particularly, the State's assertion that PPINK has an interest in avoiding compliance costs that the additional regulations would subject it to, even though its patients stand to benefit from those changes.  [Dkt. 42 at 11.]  The Court need not belabor its analysis of this point because even assuming that PPINK has standing to bring a third-party claim under § 1983 on behalf of its patients in this case, the Court concludes

- 22 -

that, on this record, PPINK has not shown a reasonable likelihood of success on the merits of that claim.

Women have a fundamental liberty interest, protected by the due process clause of the Fourteenth Amendment, in obtaining an abortion. *Roe v. Wade*, 410 U.S. 113, 154 (1973); *Planned Parenthood of Se. Penn. v. Casey*, 505 U .S. 833, 846 (1992) (a plurality of the Supreme Court reaffirming the central holding of *Roe*). As the Supreme Court has repeatedly explained, however, this right is not absolute. Specifically, "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). Put another way, "the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not prohibit any woman from making the ultimate decision to terminate her pregnancy before fetal viability or impose an undue burden on a woman's ability to make this decision." *Planned Parenthood of Indiana*, 699 F.3d at 988 (citations omitted). "An undue burden exists if the challenged law has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.*

PPINK does not argue that the challenged regulations, which would result in the Lafayette clinic not being able to provide medication abortions as of January 1, 2014, would result in an undue burden on a woman's right to obtain an abortion. [Dkts. 29; 44.] While it contends that the regulations would have "an effect" on PPINK's patients by requiring them to drive to Indianapolis (approximately 60 miles) or Merrillville (approximately 85 miles) to obtain a medication abortion, [dkt. 29 at 11-12], at no point does PPINK argue that this "effect" constitutes an

undue burden on a woman's right to obtain an abortion.[8]   Perhaps PPINK tries to sidestep argu-

ing any undue burden because of the tack it took in pursuing its own substantive due process

claim.   There it expressly argued against the validity of the State's argument for continuity of

care by suggesting that it is not an undue burden for a woman to obtain care for medication abor-

tion complications at other medical provider locations, including possibly obtaining a surgical

abortion at its Indianapolis or Merrillville locations.

   Instead of arguing that the challenged regulations result in an undue burden, PPINK fo-

cuses its argument on what it contends to be the State's burden "to prove that the regulation on

the right to an abortion actually advances its legitimate interest" and "is medically reasonable."

[Dkt. 44 at 10-11.]   But PPINK ignores that a claim is not likely to succeed when the plaintiff

does not argue that the regulation results in an undue burden, directly or indirectly, on a woman's

right to obtain an abortion.   *Planned Parenthood of Ind.*, 699 F.3d at 988; *see also Gonzales*, 550

U.S. at 157 ("[w]here it has a rational basis to act, *and it does not impose an undue burden*, the

State may use its regulatory power to bar certain procedures and substitute others, all in further-

ance of its legitimate interests in regulating the medical profession in order to promote respect

for life, including life of the unborn") (emphasis added).   Because PPINK does not argue that the

challenged regulations impose an undue burden on a woman's right to obtain an abortion, the

Court concludes that even assuming that PPINK has third-party standing to assert a Fourteenth

---

[8] PPINK also argues that the regulations would have an effect on it because PPINK may not be able to obtain permission from the owner of its building to make the physical plant modifications necessary to comply with the regulations.   [Dkt. 29 at 12-13.]   Assuming this argument is appro-priate for PPINK to make in a due process claim asserting the rights of its patients, PPINK has presented no evidence regarding the estimated cost of such modifications or that "attempting to obtain permission" from its landlord is an undue burden.   [*Id.*]   The Court was provided no ex-planation regarding why PPINK did not obtain cost estimate evidence or seek permission from its landlord.

Amendment claim on behalf of its clients, PPINK has not shown that it is likely to succeed on that claim for purposes of obtaining injunctive relief.

### B.  Other Factors

As noted above in the standard of review, to obtain a preliminary injunction, "the moving party must demonstrate a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction."  *Planned Parenthood of Ind.*, 699 F.3d at 972. If the movant makes this threshold showing, the Court "weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest."  *Id.*

The Court has already concluded that PPINK has made a strong showing regarding the reasonable likelihood of its success on the merits of its equal protection claim regarding the definition of "abortion clinic" in Indiana Code § 16-18-2-1.5, as it is applied to the Lafayette clinic. The Court will now analyze the other factors regarding injunctive relief in light of PPINK's showing on its equal protection claim.

### 1.  Irreparable Harm and Adequacy of Remedy at Law

PPINK argues that it will face irreparable harm for which there is no adequate remedy at law if the Court does not issue a preliminary injunction.  [Dkts. 29 at 22-23; 44 at 19.]  It emphasizes the constitutional nature of its claims and contends that if an injunction does not issue, it will either have to stop providing medication abortions at its Lafayette clinic or be forced to make unnecessary alterations to that facility.  [*Id.*]

In response, the State does not contend that PPINK has an adequate remedy at law, but it does dispute the alleged irreparable harm PPINK will suffer.  [Dkt. 42 at 37.]  Specifically, the

State argues that PPINK has not alleged that it would close its Lafayette clinic if it cannot offer medication abortions there.  [*Id.*]

The Court notes that PPINK only requests injunctive relief in its action, [dkt. 1 at 13], likely because the defendants have been sued in their official capacities and sovereign immunity shields them from a monetary judgment, *Nelson v. Miller*, 570 F.3d 868, 885 (7th Cir. 2009). Given the requested relief and because the State does not contend that PPINK has an adequate remedy at law, the Court concludes that PPINK has established that no adequate remedy at law exists.

The Court also concludes that PPINK has established irreparable harm.  While the State correctly notes that PPINK has not alleged that it would close the Lafayette clinic if it does not obtain injunctive relief, it completely ignores PPINK's argument that its claims are of a constitutional nature.  "When violations of constitutional rights are alleged, further showing of irreparable injury may not be required."  *Back v. Bayh*, 933 F. Supp. 738, 754 (N.D. Ind. 1996); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that likelihood of success on First Amendment violation presumed to constitute irreparable injuries).  PPINK has shown a reasonable likelihood of success on the merits of its equal protection claim, and "equal protection rights are so fundamental to our society that any violation of those rights causes irreparable harm."  *Back*, 933 F. Supp. at 754 (collecting cases).  Thus, the Court finds that PPINK has established that it faces irreparable harm if injunctive relief does not issue.

2.   Public Interest and Balance of Equities

PPINK has made a threshold showing of a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction.  Thus, the Court must "weigh[] the balance of harm to the parties if the injunction is granted or denied and also evalu-

ate[] the effect of an injunction on the public interest." *Planned Parenthood of Ind.*, 699 F.3d at 972.

The Court has concluded that for the reasons detailed above, PPINK has made a strong showing regarding the reasonable likelihood of its success on the merits of its equal protection claim regarding the definition of "abortion clinic" in Indiana Code § 16-18-2-1.5, as it is being applied to the Lafayette clinic.  This strong showing affects the balance of harms in favor of PPINK because "[t]he more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Planned Parenthood of Ind.*, 699 F.3d at 972.

The State contends that "[t]he citizens of Indiana have a strong interest in the implementation of the laws passed by their duly elected representatives." [Dkt. 42 at 38.]  While this may be true, the Court agrees with PPINK that they do not have an interest in the enforcement of a statute that, at this stage of the proceedings, PPINK has shown likely violates the Equal Protection Clause.  [Dkt. 44 at 20.]  The State also argues that the regulations further the "unobjectionable goal of protecting the health of women who undergo a medication abortion but then have complications that require surgery." [Dkt. 42 at 38.]  While this may be a valid goal, assuming it is what the regulations in fact do, the Court still concludes that the balance of harms weighs in favor of PPINK, given that it has shown a strong likelihood of success on the merits of its equal protection claim.  Moreover, as PPINK points out, issuing a preliminary injunction in this matter will serve to maintain the status quo, while not issuing it will force PPINK to decide whether to stop medication abortions at its Lafayette clinic or modify that clinic to comply with surgical facility requirements when it does not perform surgical procedures.  Given PPINK's strong likelihood of success on the merits of its equal protection claim, the Court concludes that the balancing of harms favors issuing a preliminary injunction regarding Indiana Code § 16-18-2-1.5(a)(2).

3.   Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   But the Seventh Circuit has recognized that there is no reason to require a bond in cases where the Court is satisfied that there is no danger that the opposing party will incur any damages from the injunction.  *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

PPINK asserts that issuing a preliminary injunction will not impose any monetary injuries on the State.  [Dkt. 29 at 23.]  Thus, it requests that the Court issue the injunction without requiring PPINK to post a bond.  [*Id.*]  Given that the State does not dispute this assertion or request that the Court impose a bond, [dkt. 42], the State will not require PPINK to post a bond in this case.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **GRANTS IN PART** PPINK's Motion for Preliminary Injunction.  [Dkt. 7.]  Specifically, the Court finds that PPINK is entitled to a preliminary injunction on its claim that Indiana Code § 16-18-2-1.5(a)(2) violates PPINK's equal protection rights as applied to the Lafayette clinic.  The Court concludes that PPINK has not met its burden to obtain a preliminary injunction on its remaining claims or on Indiana Code § 16-21-2-2.5(b).

Accordingly, the Court **ISSUES A PRELIMINARY INJUNCTION** pursuant to Federal Rule of Civil Procedure 65(d), such that the Defendants and their officers, agents, servants, employees, and attorneys are enjoined from enforcing Indiana Code § 16-18-2-1.5(a)(2) against

PPINK's Lafayette clinic.  PPINK need not post a bond, given that the State does not dispute

PPINK's assertion that the State will not incur monetary damages from this injunction.

11/26/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only</u>:**

Talcott Camp
AMERICAN CIVIL LIBERTIES UNION
tcamp@aclu.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
tom.fisher@atg.in.gov

Ashley Tatman Harwel
OFFICE OF THE INDIANA ATTORNEY GENERAL
ashley.harwel@atg.in.gov

Helene T. Krasnoff
PLANNED PARENTHOOD FEDERATION OF AMERICA
helene.krasnoff@ppfa.org

Heather Hagan McVeigh
OFFICE OF THE ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org