UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| *Plaintiff*, | ) ) | |
| vs. | ) ) | No. 1:13-cv-01335-JMS-MJD |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH in his official capacity, PROSECUTOR, TIPPECANOE COUNTY, INDIANA in his official capacity, | ) ) ) ) ) | |
| *Defendants*. | ) | |

## ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Presently pending before the Court are the parties' cross-motions for summary judgment. [Filing No. 71; Filing No. 73.] Plaintiff Planned Parenthood of Indiana and Kentucky, Inc. ("PPINK") asks the Court to enter summary judgment enjoining Defendants Commissioner, Indiana State Department of Health, and Prosecutor, Tippecanoe County (collectively, the "State") from enforcing Indiana Code §§ 16-18-2-1.5(a)(2) and 16-21-2-2.5(b), alleging that these statutes are unconstitutional. [Filing No. 72 at 32-33.] In response, the State defends the constitutionality of the statutes at issue and asks the Court to enter summary judgment in its favor. [Filing No. 73.]

As applied to a clinic that PPINK operates in Lafayette (the "Lafayette clinic"), PPINK challenges the constitutionality of Indiana Code § 16-18-2-1.5(a)(2), which altered the definition of "abortion clinic" to include any freestanding entity that "provides an abortion inducing drug for the purpose of inducing an abortion." It is undisputed that pursuant to the statutes at issue, PPINK must modify the Lafayette clinic to comply with certain surgical facility physical plant requirements, despite the fact that the Lafayette clinic only provides medication abortions and does

1

not provide surgical abortions or perform any other surgical procedures.[1]  PPINK contends that the statute violates the Fourteenth Amendment rights of its patients to choose an abortion, PPINK's own substantive due process rights, and PPINK's equal protection rights.  For reasons detailed below, the Court concludes that PPINK is entitled to summary judgment on its equal protection claim regarding Indiana Code § 16-18-2-1.5(a)(2), as applied to the Lafayette clinic, but that disputed issues of material fact preclude entering summary judgment on the other claims.

As applied to its clinics in Lafayette, Indianapolis, Bloomington, and Merrillville, PPINK also challenges the constitutionality of Indiana Code § 16-21-2-2.5(b)—which provides that as of July 1, 2013, the Indiana State Department of Health ("IDOH") "may not exempt an abortion clinic from … physical plant requirements."  PPINK contends that the waiver prohibition statute violates its equal protection rights.  For the reasons detailed below, the Court agrees and enters summary judgment in favor of PPINK with regard to Indiana Code § 16-21-2-2.5(b).

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or

---

[1] Indiana Code § 16-18-2-1.5(a)(2), though effective on July 1, 2013, amended the abortion clinic definition as of January 1, 2014.  However, the Court entered a preliminary injunction in favor of PPINK on November 26, 2013, with regard to the Lafayette clinic after finding that PPINK had shown a likelihood of success on its equal protection challenge to that statute.  [Filing No. 54.] Based on the presentation before it at the preliminary injunction stage, the Court concluded that PPINK had not met its burden to obtain injunctive relief with regard to Indiana Code § 16-21-2-2.5(b) as applied to the Lafayette clinic.  [Filing No. 54.]

affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," Johnson, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Ponsetti v. GE Pension Plan, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." Id. at 648.

## II.
### BACKGROUND

#### A. Relevant Statutory Framework

The IDOH licenses and regulates hospitals, ambulatory outpatient surgical centers, birthing centers, and abortion clinics. Ind. Code § 16-21-2-2. Before July 1, 2013, an "abortion clinic" was defined as "a freestanding entity that . . . performs surgical abortion procedures." I.C. § 16-18-2-1.5. On July 1, 2013, an amended statute went into effect that expanded the definition of an "abortion clinic." The new law provided that, beginning January 1, 2014, any freestanding entity that "provides an abortion inducing drug for the purpose of inducing an abortion" is also considered an abortion clinic. I.C. § 16-18-2-1.5(a)(2). The statute went on to exclude from the definition of "abortion clinic" a "physician's office as long as . . . abortion inducing drugs are not

the primarily dispensed or prescribed drug at the physician's office." I.C. § 16-18-21.5(b)(3)(B). The term "physician's office" is not defined in any relevant statutory provision.

Pursuant to Indiana Code § 16-21-1-7, rules may be adopted by the IDOH as "necessary to protect the health, safety, rights, and welfare of patients" including "[r]ules pertaining to the operation and management of hospitals, ambulatory outpatient surgical centers, abortion clinics, and birthing centers" and "[r]ules establishing standards for equipment, facilities, and staffing required for efficient and quality care of patients."

The IDOH has established physical plant specifications for abortion clinics. 410 I.A.C. 26-17-2. Among other things, an abortion clinic must have common administration and authorized visitor areas, including a reception and information counter, a waiting area containing not fewer than two spaces for each examination and procedure room, at least one conveniently accessible toilet room containing a lavatory for hand washing, a conveniently accessible drinking fountain, interview space for private interviews, and general storage facilities for supplies and equipment. 410 I.A.C. 26-17-2(c). There are also physical plant requirements for clinical facilities, including procedure rooms removed from general traffic flow that are at least 120 square feet in size, a hand washing station within each procedure room, scrub facilities near the entrance of procedure rooms, a separate recovery room with certain specifications, a drug distribution station with certain specifications, and a toilet room containing a lavatory accessible from all examination and procedure rooms. 410 I.A.C. 26-17-2(d). Design requirements for abortion clinics include, among other things, at least one housekeeping room with a service sink and adequate storage, hand washing stations, an equipment room, and an antiscald device on the hot water supply. 410 I.A.C. 26-17-2(e). The applicable regulation provides that "[c]linics operating before July 1, 2006, are exempted from requirements of this section." 410 I.A.C. 26-17-2(f).

Indiana Code § 16-21-1-9 provides that the IDOH may generally "waive a rule" for good cause shown, but the "waiver may not adversely affect the health, safety, and welfare of the residents or patients." Pursuant to the statutory amendment effective July 1, 2013, however, the IDOH "may not exempt an abortion clinic from the requirements . . . including physical plant requirements." I.C. § 16-21-2-2.5(b). As such, the new law precludes physical plant waivers for abortion clinics even where the waiver would not adversely affect the health, safety, and welfare of residents or patients.

A person who knowingly or intentionally operates an unlicensed abortion clinic commits a Class A misdemeanor. I.C. § 16-21-2-2.5(c). Additionally, the Indiana Attorney General may seek an injunction or relief that includes a civil penalty not to exceed $25,000 for each day of unlicensed operation. I.C. § 16-21-5-1.

### B. PPINK's Medication Abortion Only Clinic (Lafayette)

The following facts are undisputed, unless otherwise noted. PPINK operates 26 health centers and an administrative office in Indiana. [Filing No. 26-1 at 1.] PPINK provides medical services including Pap tests, cancer screenings, sexually transmitted disease testing and treatment, self-examination instructions, and a variety of birth control options. [Filing No. 26-1 at 1.]

PPINK's Lafayette clinic provides medication abortions but does not perform surgical abortions or any other surgical procedures. [Filing No. 26-1 at 2; Filing No. 26-2 at 5.] The Lafayette clinic has a part-time physician and is also staffed by an advanced practice nurse. [Filing No. 26-1 at 2; Filing No. 26-2 at 2.] The Lafayette clinic began providing medication abortions in August 2010. [Filing No. 26-1 at 4.] It only offers medication abortions when its physician is at the clinic. [Filing No. 26-2 at 2.] Its physician is qualified under state and federal law to prescribe

the medication to induce a non-surgical abortion and is subject to state regulation the same as any other physician. [Filing No. 26-2 at 4.]

PPINK offers medication abortions to its patients up to 63 days after the first day of the woman's last menstrual period. [Filing No. 26-2 at 2.] PPINK uses the following protocol for a medication abortion:

- Eighteen hours after meeting with a physician or advanced nurse practitioner, the woman receives information required by state law;

- Medical history and vital signs are taken;

- An ultrasound and lab testing are performed;

- A physician prescribes and dispenses the medication mifepristone (sometimes known as RU-486 or by its trade name Mifeprex), which the woman takes in pill form at the physician's office within the clinic. Mifepristone works by blocking the hormone progesterone, which is needed to maintain a pregnancy.

- The woman is given written instructions and four misoprostol pills, which she is instructed to take in 24-48 hours by placing the pills between her cheeks and gums. The woman is not required to return to the clinic to take the misoprostol but, instead, is instructed to take it at a location of her choosing.

- The woman is given an appointment to return in approximately two weeks for an ultrasound to verify that the pregnancy has been terminated. Alternatively, a blood draw can occur at the clinic and a prescription can be written for a second blood draw two weeks later at a place of the woman's choosing to measure the change in hCG levels, which is the hormone produced by the placenta.

- The woman is given an antibiotic to assist in the prevention of infection and also receives a prescription for pain and nausea reducing medications.

- The woman is informed both orally and in writing about potential side effects from the medications. She is told to expect cramping and bleeding after taking the misoprostol and that in the event of serious side effects such as heavy bleeding or fever, she can call the clinic or PPINK's 24-hour emergency number.

- If the medication abortion is not complete, the woman is given options that may include either taking another dose of misoprostol or having a surgical abortion at one of the clinics that offers that procedure.

[Filing No. 26-2 at 2-4.]

In the twelve months preceding July 1, 2013, the Lafayette clinic saw more than 4,000 unduplicated patients. [Filing No. 26-1 at 4.] During that time period, 54 women chose to have a medication abortion at the Lafayette clinic and the clinic prescribed or dispensed other medications—primarily contraceptives—more than 10,000 times. [Filing No. 26-1 at 4; Filing No. 26-2 at 5.] Terminated Pregnancy Reports from January 1, 2011, through July 1, 2013, do not disclose any complications arising from medication abortions performed at the Lafayette clinic. [Filing No. 26-1 at 4-5.] Other PPINK clinics reported complications from medication abortions, such as retained tissue that required either a second dose of misoprostol or aspiration. [Filing No. 37-5.]

In the nine months from July 1, 2013, through March 30, 2014, the Lafayette clinic saw more than 3,000 unduplicated patients. [Filing No. 71-1 at 4.] During that time period, 72 women chose to have a medication abortion at the Lafayette clinic and the clinic prescribed or dispensed other medications—primarily contraceptives—more than 7,000 times. [Filing No. 71-1 at 4.] The Terminated Pregnancy Reports from the 72 medication abortions at the Lafayette clinic from July 1, 2013, through March 30, 2014, indicate that after taking the mifepristone at the Lafayette clinic, one patient called to report that she was not going to take the misoprostol that had been given to her to take at home. [Filing No. 71-1 at 4.] That patient refused to return to the clinic for any follow up. [Filing No. 71-1 at 4.] No other complications were reported from the medication abortions performed at the Lafayette clinic during that time period. [Filing No. 71-1 at 4.]

PPINK represents that its Lafayette clinic does not comply with several physical plant requirements for abortion clinics set forth in 410 I.A.C. 26-17-2.  Because no surgical procedures are performed there, the clinic does not have scrub facilities, a recovery room or area with a recovery cart or lounge chair, or an emergency call system.  [Filing No. 26-1 at 3-4.]  PPINK has not provided evidence of the cost of compliance, but it notes that any monies spent would otherwise be used for patient care.  The State has not taken a position regarding the current compliance of the Lafayette clinic with the abortion clinic physical plant requirements.

On July 15, 2013, PPINK submitted an abortion clinic licensing application to the IDOH for the Lafayette clinic and requested that the newly applicable physical plant requirements be waived for the Lafayette clinic, since it does not perform surgical abortions or surgical procedures.  [Filing No. 1-1.]  On November 14, 2013, the IDOH issued a Notice of License Application Denial and Denial of Waiver Requests regarding PPINK's Lafayette clinic.   [Filing No. 52-1.] Specifically, the State reported that PPINK's Lafayette clinic would "qualify as an 'abortion clinic'" as of January 1, 2014, because it administers abortion inducing drugs.  [Filing No. 50 at 3.]  The State further reported that the IDOH interprets Indiana Code § 16-21-2-2.5(b) "to mean that every person who applies for a license to operate an abortion clinic for a period that will include all or some part of 'after December 31, 2013' must comply with all abortion clinic requirements, without exemption or waiver of any kind."  [Filing No. 50 at 2.]  Therefore, because PPINK has conceded that its Lafayette clinic does not comply with the physical plant requirements of 410 I.A.C. 26-17-2, the IDOH denied PPINK's application and waiver request for the Lafayette clinic.  [Filing No. 50 at 3.]

**C. PPINK's Surgical Abortion Clinics (Indianapolis, Bloomington, and Merrillville)**

PPINK has clinics in Indianapolis, Bloomington, and Merrillville that provide first trimester surgical abortions. [Filing No. 26-1 at 1.] These clinics also provide non-surgical abortions, also known as medication abortions. [Filing No. 26-1 at 2.] These three clinics were licensed as abortion clinics before July 1, 2006, so historically they were not required to comply with the physical plant requirements pursuant to 410 I.A.C. 26-17-2(f). [Filing No. 71-1 at 1.] The State confirmed at oral argument that it construes Indiana Code § 16-21-2-2.5(b) to prohibit the IDOH from exempting an abortion clinic from physical plant requirements. Accordingly, the State maintains that PPINK's Indianapolis, Bloomington, and Merrillville clinics now must comply with all physical plant requirements. [Filing No. 71-1 at 2.]

PPINK represents that its Bloomington clinic is in the process of being renovated and that it will comply with the physical plant requirements once the renovations are complete. [Filing No. 71-1 at 2.] PPINK represents that its Indianapolis clinic currently complies with nearly all physical plant requirements, but that it "does not have an 'antiscald device' on the hot water supply limiting the water temperature." [Filing No. 71-1 at 2.] PPINK represents that its Merrillville clinic does not comply with several physical plant requirements: its waiting and visitor area does not have a drinking fountain, the chairs in the recovery room do not comply with the minimum clearance area, the drug distribution station in the recovery room does not have a sink, there is no separate housekeeping room, and there is no antiscald device on the hot water supply limiting the water temperature. [Filing No. 71-1 at 2-3.] PPINK has not provided evidence of the cost of compliance for these clinics, but it again notes that any monies spent would otherwise be used for patient care.

The abortion clinic licenses for Indianapolis, Bloomington, and Merrillville expired on June 30, 2014. [Filing No. 71-1 at 2.] The State has not taken a position regarding the current or

anticipated compliance of the Indianapolis, Bloomington, or Merrillville clinics with the physical plant requirements set forth in 410 I.A.C. 26-17-2. PPINK represented at oral argument that it has applied for license renewals for these clinics, that licenses temporarily extend pending site visits, and that the site visits had not yet occurred.

### D. Procedural History

On August 22, 2013, PPINK sued the Commissioner of the IDOH and the Tippecanoe County Prosecutor, asking for declaratory and injunctive relief from the challenged Indiana statutes with respect to the Lafayette clinic. [Filing No. 1 (challenging the constitutionality of Indiana Code § 16-18-2-1.5(a) (definition of "abortion clinic") and § 16-21-2-2.5(b) (prohibiting the IDOH from exempting an abortion clinic from, among other things, the physical plant requirements)).]

PPINK challenges the constitutionality of Indiana Code § 16-18-2-1.5(a)(2) as applied to the Lafayette clinic, to the extent that it requires that clinic to comply with the surgical physical plant requirements even though it does not perform surgical abortions or any surgical procedures. Specifically, PPINK brings a Fourteenth Amendment claim on behalf of its patients' right to choose an abortion, a substantive due process claim on its own behalf, and an equal protection claim on its own behalf.

On November 26, 2013, the Court entered a preliminary injunction in favor of PPINK regarding the constitutionality of Indiana Code § 16-18-2-1.5(a)(2) as applied to the Lafayette clinic. [Filing No. 54.] The Court found that PPINK had shown a reasonable likelihood of success on the merits of its equal protection challenge to that statute, and that the other injunctive factors also weighed in its favor, to the extent that Indiana Code § 16-18-2-1.5 requires the Lafayette clinic to comply with the surgical physical plant requirements although it does not perform surgical

abortions or any surgical procedures.  [Filing No. 54 at 10-17.]  The Court did not find that PPINK had shown a reasonable likelihood of success on its Fourteenth Amendment claim on behalf of its patients, on its own substantive due process claim, or on its equal protection challenge to the abortion clinic waiver prohibition as applied to the Lafayette clinic in Indiana Code § 16-21-2-2.5(b).  [Filing No. 54 at 17-25.]  Thus, the Court did not grant injunctive relief with regard to the abortion clinic waiver prohibition.  [Filing No. 54 at 28.]

On April 15, 2014, the parties filed a Revised Stipulation Concerning Additional Factual Issues, stipulating that PPINK also intends to challenge the constitutionality of the abortion clinic waiver prohibition in Indiana Code § 16-21-2-2.5(b) with regard to its surgical abortion clinics on equal protection grounds.  The State agreed it would not oppose that request for relief on PPINK's failure to amend its complaint to explicitly seek such relief.  [Filing No. 70 at 2.]  The State has at not challenged the procedural propriety of including the surgical abortion clinics in the instant cross-motions.

On April 30, 2014, PPINK moved for summary judgment on all of its claims.  [Filing No. 71.]  On June 3, 2014, the State responded and filed a cross-motion for summary judgment.  [Filing No. 73.]  The Court held an oral argument on the cross-motions for summary judgment on October 30, 2014, and took the matter under advisement.  [Filing No. 80.]

### III.
### DISCUSSION

As applied to its Lafayette clinic, PPINK contends that the statutes at issue violate its patients' right to choose an abortion under the Fourteenth Amendment to the United States Constitution, PPINK's own substantive due process rights, and PPINK's equal protection rights. As applied to its Indianapolis, Bloomington, Merrillville, and Lafayette clinics, PPINK contends that Indiana Code § 16-21-2-2.5(b) violates its equal protection rights.  PPINK asks the Court to

enter summary judgment in its favor and grant injunctive relief precluding the State from applying Indiana Code § 16-18-2-1.5(a)(2) to its Lafayette clinic and Indiana Code § 16-21-2-2.5(b) to PPINK's Indianapolis, Bloomington, Merrillville, and Lafayette clinics. [Filing No. 72 at 32-33.] In response, the State contends that it is entitled to summary judgment as a matter of law on all of PPINK's claims. [Filing No. 73; Filing No. 74.] Before addressing the merits of the parties' arguments, the Court will summarize recent Seventh Circuit precedent that guides its analysis.

**A. Controlling Seventh Circuit Precedent**

A few weeks after this Court issued its preliminary injunction decision, [Filing No. 54], the Seventh Circuit Court of Appeals decided *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014). At issue in *Van Hollen* was the constitutionality of a Wisconsin statute prohibiting a doctor, under threat of heavy penalties, from performing an abortion unless he had admitting privileges at a hospital no more than 30 miles from the clinic at which the abortion was performed. 738 F.3d at 787. The statute only gave doctors who performed abortions one weekend to obtain the necessary admitting privileges at a hospital. *Id.* at 788. The plaintiffs promptly filed an action pursuant to 42 U.S.C. § 1983 and requested a preliminary injunction, which the district court granted on "[t]he sparse evidentiary record." *Id.* The defendants appealed to the Seventh Circuit Court of Appeals. *Id.*

At the outset of the decision, *Van Hollen* emphasized that "[a]ll we decide today is whether the district judge was justified in entering the preliminary injunction. Evidence presented at trial may critically alter the facts found by the district judge on the basis of the incomplete record compiled in the first month of the suit, and recited by us." *Id.*

The stated rationale for the admitting privileges statute in *Van Hollen* was "to protect the health of women who have abortions." *Id.* at 789. Proponents of the law argued that it fostered

continuity of care because if a woman required hospitalization because of complications from an abortion, the doctor who performed the abortion would have admitting privileges at a nearby hospital. *Id.* The plaintiff disagreed, arguing that the statute "would do nothing to improve women's health" and its "only effect would be to reduce abortions by requiring abortion doctors to jump through a new hoop: acquiring admitting privileges at a hospital within 30 miles of their clinic." *Id.*

In analyzing the stated rationale for the law, the Seventh Circuit noted as follows:

No other procedure performed outside a hospital, even one as invasive as a surgical abortion (such as a colonoscopy, or various arthroscopic or laparoscopic procedures), and even if performed when the patient is under general anesthesia, and even though more than a quarter of all surgery in the United States is now performed outside of hospitals, is required by Wisconsin law to be performed by doctors who have admitting privileges at hospitals within a specified, or indeed any, radius of the clinic at which the procedure is performed. That is true even for gynecological procedures such as diagnostic dilation and curettage (removal of tissue from the inside of the uterus), hysteroscopy (endoscopy of the uterus), and surgical completion of miscarriage (surgical removal of fetal tissue remaining in the uterus after a miscarriage, which is to say a spontaneous abortion), that are medically similar to and as dangerous as abortion—or so at least the plaintiffs argue, without contradiction by the defendants. These procedures, often performed by the same doctors who perform abortions, appear to be, from a medical standpoint, virtually indistinguishable from abortion.

*Id.* at 789-90 (citation omitted). *Van Hollen* pointed out that "[a]n issue of equal protection of the laws is lurking in this case. For the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications." *Id.* at 790.

In addressing the Fourteenth Amendment undue burden claim, *Van Hollen* held that "[t]he cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an 'undue burden' on women seeking abortions." *Id.* at 798 (citing *Planned*

*Parenthood of Southeastern Penn. v. Casey*, 505 U.S. at 874, 877, 900-01 (1992) (plurality opinion); *Stenberg v. Carhart*, 530 U.S. 914, 930, 938 (2000); *cf. Mazurek v. Armstrong*, 520 U.S. 968, 972-73 (1997) (per curiam)).  "The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."  *Van Hollen*, 738 F.3d at 798.  The Seventh Circuit specifically noted that "[i]t is not a matter of the number of women likely to be affected.  'An undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"  *Id.* (quoting *Casey*, 505 U.S. at 877).

*Van Hollen* concluded that "[i]n this case the medical grounds thus far presented ('thus far' being an important qualification given the procedural setting—a preliminary-injunction proceeding) are feeble, yet the burden great because of the state's refusal to have permitted abortion providers a reasonable time within which to comply."  *Van Hollen*, 738 F.3d at 798.  In reaching that conclusion, *Van Hollen* emphasized that the defendants had not presented evidence of a health benefit, other than an inconclusive affidavit by one doctor about one abortion patient from another state.  *Id.* at 795.  *Van Hollen* cited a study regarding the infrequency of abortion complications requiring hospitalization, noting that only 1 in 1,915 aspiration abortions (0.05%) and 1 in 1,732 medication abortions[2] (0.06%) result in complications requiring hospitalization, and pointed out that "the state has been chary in the presentation of evidence" regarding "[w]hat fraction of these hospitalizations go awry because the doctor who performed the abortion did not have admitting privileges at the hospital to which the woman was taken."  *Id.* at 797.  Furthermore, *Van Hollen* emphasized that "nothing in the statute requires an abortion doctor who has admitting

---

[2] *Van Hollen* refers to these as "medical abortions" but the parties here call the procedure a "medication abortion."  738 F.3d at 798.

privileges to care for a patient who has complications from an abortion. He doesn't have to accompany her to the hospital, treat her there, visit her, call her, or indeed do anything that a doctor employed by the hospital might not do for the patient." *Id.* at 798.

For these reasons, the Seventh Circuit affirmed the district court's preliminary injunction. *Id.* at 798. It opined that the district court "may want to reconsider appointing a neutral medical expert to testify at the trial, as authorized by Fed. R. Evid. 706." *Id.* at 798. "[G]iven the technical character of the evidence likely to figure in the trial—both evidence strictly medical and evidence statistical in character concerning the consequences both for the safety of abortions and the availability of abortion in Wisconsin" and "the passions that swirl about abortion rights and their limitations[,] there is a danger that party experts will have strong biases, clouding their judgment." *Id.* at 798-99. In its conclusion, *Van Hollen* again emphasized that "the trial on the merits may cast the facts we have recited, based as they are on the record (by no means slim, however, though entirely documentary) of the preliminary-injunction proceeding, in a different light."[3] *Id.* at 799.

## B. Fourteenth Amendment Right to Choose an Abortion[4]

PPINK asserts a claim on behalf of its patients regarding Indiana Code § 16-18-2-1.5(a)(2), which amends the definition of "abortion clinic" to include any freestanding entity that provides an abortion inducing drug even if it does not perform surgical abortions, such as the Lafayette

---

[3] The district court in *Van Hollen* held a bench trial in May 2014, but has not yet issued a decision.

[4] The State argued in its opening brief that PPINK did not have standing to litigate the constitutional rights of its patients in this action. [Filing No. 74 at 18-23.] PPINK opposed this argument in its response, [Filing No. 75 at 8-13 (relying in part on *Van Hollen*, 738 F.3d at 794-95)], and the State conceded in its reply that *Van Hollen* resolved the issue, [Filing No. 78 at 4], but seeks to preserve the issue for appeal. The Court agrees that *Van Hollen* resolved the issue in favor of an abortion provider's standing to sue to enjoin laws restricting abortion, 738 F.3d at 794-95, and will not address the issue further. It is preserved for appeal, however, pursuant to the State's request. [Filing No. 78 at 4.]

clinic. Specifically, PPINK contends that the statute violates its patients' Fourteenth Amendment right to choose an abortion because its effect is not reasonably related to promoting women's health. [Filing No. 72 at 16-22.] PPINK claims that the statute "imposes an undue burden on women's access to abortion because there is no medical justification whatsoever for requiring that the Lafayette health center meet physical standards designed for surgery." [Filing No. 72 at 17.] PPINK believes that the statute is not reasonably related to the goal of advancing maternal health for two reasons—1) the Lafayette clinic does not perform surgical abortions or surgical procedures, and the legislation at issue would not require it to do so even if the Lafayette clinic complied with the surgical physical plant requirements at issue; and 2) PPINK offers adequate continuity of care because patients may contact a medical professional at all times. [Filing No. 72 at 21-22.] PPINK concludes that the challenged legislation "is simply unnecessary to promote women's health as there is no evidence at all—nor could there be—that the status quo poses a threat in any way to women's health." [Filing No. 72 at 21.]

In response, the State argues that requiring the Lafayette clinic to comply with surgical physical plant requirements even though it does not perform surgical abortions does not have the purpose or effect of putting a substantial obstacle in the path of a woman seeking an abortion. [Filing No. 74 at 24.] The State emphasizes that PPINK "does not even purport to provide actual evidence showing that the result of this law is 'likely to prevent' a 'large fraction' of women 'from obtaining an abortion,'" [Filing No. 74 at 24 (quoting *Casey*, 505 U.S. at 893-95)], and does not estimate costs for any changes that would be necessary for it to comply with the surgical physical plant requirements, [Filing No. 74 at 25]. The State cites evidence from its expert and concludes that "the risks associated with medication abortions are not merely minor or hypothetical—they are severe and widely attested, and some call for surgical intervention." [Filing No. 74 at 31.] It

contends that the Court must apply a deferential standard and uphold an abortion-related statute as long as the legislature had a rational basis to act to further a valid goal. [Filing No. 74 at 28-29.]

In reply, PPINK contends that the State ignores *Van Hollen*'s requirement that abortion-related statutes sought to be justified on medical grounds require evidence that the medical grounds are legitimate. [Filing No. 75 at 14.] PPINK contends that the State presented no evidence that the medical grounds for the statute are legitimate and because the articulated medical grounds are allegedly so feeble, PPINK argues that the burdens it imposes cannot be justified and must be undue. [Filing No. 75 at 17.]

In the reply supporting its cross-motion, the State emphasizes that PPINK "has never substantiated *any* financial or practical difficulty of adapting its Lafayette clinic to the physical plant requirements imposed." [Filing No. 78 at 9 (original emphasis).] Thus, the State contends that the statute is only subject to rational basis review because PPINK "never properly seeks to establish an 'undue burden.'" [Filing No. 78 at 8.]

### 1) *Expert Evidence*

Each party relies on its own expert's opinion to support its summary judgment arguments. [*See, e.g.*, Filing No. 72 at 7-14 (PPINK's opening brief relying on its expert's affidavit in its "[s]tatement of material facts not in dispute"); Filing No. 74 at 8-11 (State's response brief and cross-motion for summary judgment, relying on its expert's affidavit in its "statement of material facts not in dispute").] As it is the primary evidence on which they rely, the Court will summarize each party's expert testimony.

### a) PPINK's Expert—Dr. Blumenthal

PPINK relies on an affidavit from Dr. Paul D. Blumenthal, a board-certified obstetrician/gynecologist and Professor at the Stanford University School of Medicine. [Filing

No. 26-3 at 2.]  Dr. Blumenthal details his qualifications, [Filing No. 26-3 at 2-3], and then provides his medical opinion that "[m]edication abortion is extremely safe[,]" [Filing No. 26-3 at 4].  To support this opinion, Dr. Blumenthal cites studies that he attests report that the mortality rate of medication abortion is less than 1 per 100,000 abortions, which he contends is comparable to the rate for first-trimester surgical abortions.  [Filing No. 26-3 at 4-5.]  Dr. Blumenthal reports that this is fourteen times lower than a woman's risk of death in childbirth.  [Filing No. 26-3 at 5.] He further opines that "[a]dverse events following medication abortion are exceedingly rare." [Filing No. 26-3 at 5.]  He cites a 2013 study of Planned Parenthood health centers across the country that he contends "showed a rate of clinically significant adverse events (defined to include hospital admission, blood transfusion, emergency department treatment, intravenous antibiotics administration, infection requiring treatment with intravenous antibiotics or admission to the hospital, and death) of just 0.16 percent."  [Filing No. 26-3 at 5.]

Dr. Blumenthal opines that the only complication that can arise at the health center during a medication abortion is if the woman suffers an allergic reaction when she takes the mifepristone. [Filing No. 26-3 at 6.]  He has neither experienced nor heard of a woman having an allergic reaction to mifepristone, and he contends that no specific physical space at a clinic would be required to treat such a reaction.  [Filing No. 26-3 at 6.]  Dr. Blumenthal attests that "[o]f the small percentage of women having any complication from medication abortion, by far the most common complication is an incomplete abortion, which happens if some tissue is retained in the uterus, typically causing bleeding or spotting."  [Filing No. 26-3 at 6.]  He points out that this will happen away from the office and that "[i]f the abortion is not complete, which happens in 2-5% of cases, the patient has the option to take a second dose of misoprostol in the hope of completing the

abortion, to do an aspiration procedure similar to a surgical abortion, or to simply wait for the tissue to pass." [Filing No. 26-3 at 6.]

Contained within that 2-5% of patients who have incomplete abortions, Dr. Blumenthal attests that 0.5% of them have a continuing pregnancy. [Filing No. 26-3 at 6.] For that reason, it is the standard of care for medication abortion patients to have either an ultrasound or a pregnancy test one to two weeks after taking the misoprostol to confirm that the abortion was successful. [Filing No. 26-3 at 6.] If a patient has a continuing pregnancy, she has the option to take a second dose of misoprostol or to have a surgical procedure to complete the abortion. [Filing No. 26-3 at 6-7.]

Dr. Blumenthal concludes that using PPINK's procedure, "women have been able to safely avoid a surgical procedure 98 percent of the time." [Filing No. 26-3 at 7.] He contends that even in the cases where a woman who had a medication abortion elects to or needs to have a surgical procedure to complete the abortion, "it need not be performed immediately and it is not necessary that it be performed at the same health center where she took the mifepristone." [Filing No. 26-3 at 7.] He further points out that "in the extremely rare case that a medication abortion patient has experienced sufficient blood loss that she might need emergency treatment (such as a transfusion, or fluid support), it will occur more often one to three weeks after the procedure[, a]nd the protocol in such a situation is the same in any outpatient setting . . . advise her to go to the nearest emergency room." [Filing No. 26-3 at 7.]

For these reasons, Dr. Blumenthal concludes that while a medication abortion provider needs to have the ability to refer a woman to a surgical provider on a non-urgent basis, "the only possible specialized 'equipment' needed to safely provide medication abortion is an ultrasound machine[, a]nd the only possible physical space needed is a small examination room in which to

perform the ultrasound and for her blood to be drawn." [Filing No. 26-3 at 7-8.] Dr. Blumenthal further concludes that "medication abortion can be safely provided in PPINK's Lafayette health center" without it meeting the challenged physical plant requirements. [Filing No. 26-3 at 11.] He contends that "[a]ny delay in access to medication abortion is significant because medication abortion is available at PPINK only until sixty-three days after the first day of the woman's last menstrual period." [Filing No. 26-3 at 11.] Dr. Blumenthal ultimately opines that "[a]llowing health centers without procedure rooms, scrub facilities, emergency call systems, and recovery rooms to provide medication abortions provides greater access to this oft-needed gynecological service without compromising any patient safety and thus serves an important health function." [Filing No. 26-3 at 12.]

### b) The State's Expert—Dr. Thorp

The State relies on an affidavit from Dr. John Thorp, Jr., a board-certified obstetrician/gynecologist and Professor of Obstetrics and Gynecology at the University of North Carolina. [Filing No. 37-1 at 1-2.] Dr. Thorp details his qualifications, [Filing No. 37-1 at 2-3], and then provides his medical opinion "that risks from medication abortion—which include failed abortion, incomplete abortion, bleeding, and infection—are greater than for surgical abortion." [Filing No. 37-1 at 4.] To support this opinion, Dr. Thorp cites a 2009 study "that the incidence of hemorrhage is 15.6 percent following medication abortions, compared to 5.6 percent for surgical abortions; 6.7 percent of medication abortions result in incomplete abortion, compared to 1.6 percent of surgical abortions; and the rate of need for surgery following medication abortion is 5.9 percent." [Filing No. 37-1 at 4.] Dr. Thorp also cites a 2011 FDA report acknowledging that at least 2,207 cases of severe adverse events, including hemorrhaging, blood loss requiring transfusion, serious infection, and 14 deaths. [Filing No. 37-1 at 4.] He points out that in 2009,

Planned Parenthood estimated that 32% of first-trimester abortions performed in its centers in 2008 were by medication. [Filing No. 37-1 at 5.] Dr. Thorp cites a 1999 study for his conclusion that "18.3% of medication abortions fail, as compared to only 4.7% of surgical abortions." [Filing No. 37-1 at 5.] He further contends that "5.7% of medication abortion patients require admittance to a hospital, while hospitalization was necessary for only 0.4% of surgical abortion patients." [Filing No. 37-1 at 5-6.]

Dr. Thorp points to three main benefits of the requirement that a clinic that performs only medication abortions be prepared to perform surgery in an emergency: 1) it acknowledges and enables the importance of continuity of care; 2) it enhances inter-physician communication and optimizes patient information transfer and complication management; and 3) it supports the ethical duty of care for the operating physician to prevent patient abandonment. [Filing No. 37-1 at 6-7.] Dr. Thorp concludes that when an abortion provider is able to treat complications at the clinic, it is "more likely to effectively manage patient complications by providing continuity of care and decrease the likelihood of medical errors." [Filing No. 37-1 at 7.] He further opines that he believes most patients "would assume that their doctor for a medication abortion would be able to diagnose and treat any unforeseen complications or harms that could arise from the procedure. Thus, not having the ability to perform necessary emergency surgery if required violates the patient's legitimate expectations of safety." [Filing No. 37-1 at 7-8.]

Dr. Thorp opines that the statutes at issue facilitate continuity of care because "inter-physician communication is insufficient at transition points of patient care." [Filing No. 37-1 at 8.] He cites a 2003 study that an information gap was identified in 29.4% of patients presenting at the emergency department and that the most prevalent gap was in medical history. [Filing No. 37-1 at 8-9.] Dr. Thorp opines that "because of the stigma and shame occasionally associated with

induced abortion, many women may be reluctant even to disclose a termination of pregnancy in accessing emergency medical care which can place them at increased risk." [Filing No. 37-1 at 7.] For these reasons, Dr. Thorp concludes that the statutes at issue are "reasonable and beneficial" because the doctor who administers the medication abortion is most familiar with the patient's history and is "best positioned with the knowledge necessary to diagnose and correct complications that arise." [Filing No. 37-1 at 8.] He further opines that the physical plant requirements of which PPINK complains with regard to its Lafayette clinic protect "the health and safety of women who undergo a medication abortion" by facilitating continuity of care "whether those complications arise during the patient's initial visit or regular follow-up visit, or whether the complications prompt an unexpected return to the clinic for examination, diagnosis and treatment." [Filing No. 37-1 at 11.]

Dr. Thorp notes that PPINK does not contest that some women who terminate their pregnancies with medication abortion "are at risk of serious, even life-threatening complications." [Filing No. 37-1 at 13.] He concludes that "[i]t is for these women that [these statues] appl[y]." [Filing No. 37-1 at 13.]

c) Dr. Blumenthal's Rebuttal Affidavit

Dr. Blumenthal provides his supplemental declaration to "offer [his] opinions on certain of the assertions in Dr. Thorp's declaration." [Filing No. 44-2 at 1.] Dr. Blumenthal opines that Dr. Thorp "provides a very misleading—and in some cases, wholly inaccurate—look at the safety of medication abortion." [Filing No. 44-2 at 2.] He criticizes Dr. Thorp's interpretation of various statistics in a 2011 Food and Drug Administration report, and contends that other studies on which Dr. Thorp relied are "flawed," "of little relevance," or "not highly relevant today." [Filing No. 44-2 at 2-3.] Dr. Blumenthal opines that a study on which he relies "is much more relevant to this

case" and that Dr. Thorp "overstates the rate that medication abortions fail[], the need for surgery following medication abortion, and the rate of incomplete medication abortion." [Filing No. 44-2 at 4.]

Dr. Blumenthal provides additional opinions regarding the requisite continuity of care for medication abortion patients. [Filing No. 44-2 at 7-9.] He concludes that "[t]here is no reason that the surgical follow up—or any follow up care—needs to be provided by the same physician or provider who prescribed the mifepristone at all—and certainly not in the same physical space as where the mifepristone was administered." [Filing No. 44-2 at 7.] He specifically criticizes Dr. Thorp's continuity of care opinions for various reasons, ultimately concluding that they are "of no relevance in this case." [Filing No. 44-2 at 7-9.]

### 2) *Disputed Issues of Material Fact Preclude Summary Judgment*

As the foregoing demonstrates, and despite the parties' representations to the contrary, disputed issues of material fact exist that preclude summary judgment in favor of either party on PPINK's Fourteenth Amendment claim based on its patients' right to choose an abortion. Each party relies on its own expert evidence to support its arguments regarding the safety of medication abortions, the prevalence and proper treatment of serious medical complications, and the requirements for continuity of care. [*See, e.g.*, Filing No. 72 at 7-14 (PPINK's opening brief relying on its expert's affidavit in its "[s]tatement of material facts not in dispute"); Filing No. 74 at 8-11 (State's response brief and cross-motion for summary judgment, relying on its expert's affidavit in its "statement of material facts not in dispute").] Each party then uses its own expert's conclusions to support its arguments regarding the reasonableness of the surgical physical plant requirements for a clinic that does not perform surgical abortions, such as the Lafayette clinic.

Relying on its own expert's opinion, PPINK claims it is undisputed that "[m]edication abortion is an extremely safe procedure." [Filing No. 72 at 9 (citing Filing No. 26-3 at 4-5).] In response, the State specifically disputes PPINK's representation that "medication abortion is an extremely safe procedure," [Filing No. 74 at 5], instead relying on its expert's conclusion that "medication abortion fails more often and is riskier for women than surgical abortion[,]" [Filing No. 74 at 5 (citing Filing No. 37-1 at 5-6)]. In its reply, PPINK counters that "there can be no dispute that medication abortion is an extremely safe procedure," citing the portion of its brief that heavily relies on PPINK's expert's opinion. [Filing No. 75 at 2 (citing Filing No. 72 at 9-10 (relying on Filing No. 26-3))]. PPINK criticizes the State's expert's interpretation of various statistics and contends that additional studies on which the State's expert relied are "flawed," "of little relevance," or "not highly relevant today." [Filing No. 44-2 at 2-3.]

As noted, this strategy violates the well-established standard of review for evaluating cross-motions for summary judgment, which requires the Court to make reasonable inferences in favor of the non-moving party when evaluating the moving party's motion, and then make inferences in favor of the other party when evaluating the cross-motion. In ruling on PPINK's motion for summary judgment, and making all reasonable inferences in favor of the State, including those from the State's expert evidence, the Court concludes that the State's purported rationale for applying the surgical physical plant requirements to the Lafayette clinic is not so illegitimate as to entitle PPINK to summary judgment as a matter of law. In ruling on the State's motion for summary judgment, and making all reasonable inferences in favor of PPINK, including those from PPINK's expert evidence, the Court concludes that the State's purported rationale for applying the surgical physical plant requirements to the Lafayette clinic is not so legitimate nor the burden so slight as to entitle the State to summary judgment as a matter of law. In sum, the parties' competing

expert evidence on key issues highlights disputed issues of material fact that preclude summary judgment in favor of either party on PPINK's Fourteenth Amendment claim based on its patients' right to choose an abortion.[5]

Van Hollen bolsters this Court's conclusion. Throughout that decision, the Seventh Circuit Court of Appeals referenced the extensive evidence it expected the parties to present at a trial on the merits, emphasizing "the technical character of the evidence likely to figure in the trial—both evidence strictly medical and evidence statistical in character concerning the consequences both for the safety of abortions and the availability of abortion . . . ." 738 F.3d at 798. Van Hollen suggested that the district court may want to appoint a neutral medical expert to testify at trial, as authorized by Federal Rule of Evidence 706, to "help the judge to resolve the clash of the warring party experts." Id. at 798-99. Van Hollen did not contemplate that the case before it could be resolved on summary judgment, likely because of what the parties in this case ignore—that it is inappropriate for the Court to make credibility and reliability determinations regarding competing expert opinions on summary judgment. See Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."); Giles v. Ludwig, 2014 WL 4358475, at *3 (N.D. Ill. 2014) ("Resolution of competing

---

[5] PPINK argues that because it is undisputed that complications will occur away from the clinic where the initial dose of medication is administered, any disputes regarding the safety of medication abortion and continuity of care are immaterial. [See e.g., Filing No. 72 at 10-11.] As the State pointed out at oral argument, however, there is evidence in the record that some patients experiencing complications from medication abortions returned to PPINK clinics for follow up care. [Filing No. 37-5.] The Court credits this evidence in favor of the State's continuity of care arguments on summary judgment when considering PPINK's request for summary judgment. Thus, the Court does not find the undisputed fact that complications arise away from the clinic to be dispositive as a matter of law.

experts' opinions requires credibility determinations that are inappropriate for the Court to engage in at the summary judgment stage.").

Indeed, the standard set forth in *Van Hollen* requires a qualitative evaluation of the evidence regarding the legitimacy of the medical grounds as weighed against the evidence regarding any burden the statute imposes to determine if it is undue. 738 F.3d at 798 ("[t]he cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an 'undue burden' on women seeking abortions"). The factfinder must apply a balancing test where "[t]he feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous." *Id.* The parties in this case did not consent for the Court to try this matter on a written record, as allowed by Federal Rule of Civil Procedure 52, *see Eirhart v. Libbey-Owens-Ford Co.*, 996 F.2d 837, 840 (7th Cir. 1993) ("Rule 52 allows for matters to be tried to the district court on a written record; we do not read the Rule to require that an evidentiary hearing be held."), and it is inappropriate for the Court to be a factfinder on summary judgment, *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) ("It is the job of the [factfinder], and not the district court judge at summary judgment, to determine which party's evidence to credit.").

In sum, the parties present competing expert evidence on the safety of medication abortion, the prevalence and treatment of adverse medical conditions resulting from medication abortion, and what constitutes adequate continuity of care. These disputed issues of material fact are central to a determination of the Fourteenth Amendment undue burden analysis and directly bear on the reasonableness of the physical plant requirements that PPINK challenges. Accordingly, the Court

cannot grant summary judgment to either party on PPINK's Fourteenth Amendment claim on behalf of its patients' right to choose an abortion.

### C. Substantive Due Process Claim

PPINK brings a substantive due process claim on its own behalf regarding the amendment of the definition of "abortion clinic" to include clinics, such as the Lafayette clinic, that do not provide surgical abortions. [Filing No. 72 at 22-24 (challenging I.C. § 16-18-2-1.5(a)(2)).] PPINK concedes that its claim is subject to rational basis review because it is not asserting that the statute encroaches on a fundamental right. [Filing No. 72 at 23.] PPINK argues that it is entitled to summary judgment on this claim because it is "fundamentally irrational to require a clinic that does not perform surgical abortions, and only dispenses medication, to abide by standards that are specifically designed for clinics that perform abortions." [Filing No. 72 at 22.]

In response, the State argues that it is entitled to summary judgment on PPINK's substantive due process claim. [Filing No. 74 at 34-36.] The State emphasizes that PPINK has not set forth any description of the right it seeks to have protected. [Filing No. 74 at 35.] Thus, the State urges the Court to grant summary judgment in its favor for the same reasons the Court found PPINK unlikely to succeed on the merits of its claim at the preliminary injunction stage. [Filing No. 74 at 35.]

In its reply, PPINK emphasizes that "it makes no sense to impose surgical requirements on a clinic that performs no surgery," especially because adverse effects will occur away from the clinic where the initial dose of medication is administered. [Filing No. 75 at 30.] PPINK criticizes a report on which the State relies to support its argument regarding the rationality of requiring the Lafayette clinic to comply with the surgical physical plant requirements. [Filing No. 75 at 30-31.]

In the reply supporting its cross-motion, the State emphasizes that PPINK still has not offered "a careful description of the asserted right" it seeks to vindicate. [Filing No. 78 at 8.] Thus, the State asks the Court to enter summary judgment in its favor on that basis. [Filing No. 78 at 8.]

Generally, "substantive due process is applicable only when the government deprives a person of a 'fundamental' right." *Markadonatos v. Vill. of Woodridge*, 760 F.3d 545, 554 (7th Cir. 2014) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719-23 (1997)). Officials bear a heavy burden of justification for curtailing a right that qualifies as fundamental. *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 575 (7th Cir. 2014) (citing *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (infringement must be narrowly tailored to serve a compelling state interest) (collecting cases))). But even if a fundamental right is not implicated, "there is a residual substantive limit on government action which prohibits arbitrary deprivations of liberty by government." *Hayden*, 743 F.3d at 576. When a non-fundamental liberty is at stake, the government need only demonstrate that the intrusion upon that liberty is rationally related to a legitimate government interest. *Id.*

PPINK concedes that it is not asserting that the State deprived it of a fundamental right. [Filing No. 72 at 22-23.] Instead, PPINK seeks to be free from arbitrary and irrational government regulation, which it contends substantive due process protects. [Filing No. 72 at 22-23 (citing *Hayden*, 743 F.3d at 576).] Ultimately, however, the parties' arguments dispute the rationality of requiring medication abortion providers—such as the Lafayette clinic—to comply with a surgical abortion clinic's physical plant requirements, even if no surgeries are performed. PPINK contends that the requirement is arbitrary and irrational, and the State contends that it is legitimate to protect the health of the patients.

Each party's position regarding the alleged rationality or irrationality of the legislation at issue hinges on its expert's opinion regarding the reasonableness of the legislation. The Court has already concluded that, when viewing the parties' arguments through the appropriate summary judgment standard, disputed issues of material fact exist regarding the safety of medication abortion, the prevalence and treatment of adverse medical conditions resulting from medication abortion, and what constitutes adequate continuity of care. These issues directly bear on the reasonableness of the physical plant requirements at issue. Thus, for the same reasons that the Court could not grant summary judgment to either party on PPINK's claim on its patients' behalf, it must also deny summary judgment in favor of either party on PPINK's substantive due process claim.

**D. Equal Protection Claim**

PPINK asserts an equal protection claim on its own behalf regarding both of the statutes at issue. The Court will separately address PPINK's challenge to each statute.

*1) "Abortion Clinic" Definition Excepting "Physician's Office"*

PPINK contends that Indiana Code § 16-18-2-1.5 violates its rights under the Equal Protection Clause as applied to the Lafayette clinic because the statute creates two groups of medication abortion providers—"abortion clinics" and "physician's offices"—and then treats those groups differently without a rational basis for doing so. [Filing No. 72 at 27-28.] PPINK concedes that its equal protection claim is subject to rational basis review, but it argues that the State has no rational basis for the differential treatment at issue. [Filing No. 72 at 27-28.]

In response, the State submits an affidavit that it contends proves that medication abortions are not performed at physician's offices. [Filing No. 74 at 12-13 (citing Filing No. 73-1).] It claims that this evidence "substantiates the State's theory that physicians' offices do not pose the

same risks as other facilities when it comes to caring for women who have had a medication or surgical abortion." [Filing No. 74 at 13.] The State contends that physicians who operate their own practice "are typically less regulated than other medical facilities." [Filing No. 74 at 13-14.] Thus, the State concludes that the legislature had a rational basis for treating physician's offices differently than abortion clinics in this context. [Filing No. 14-15.]

In reply, PPINK emphasizes that the term "physician's office" is undefined. [Filing No. 75.] Thus, PPINK contends that the State's affidavit purporting to show that physician's offices do not perform medication abortions is not definitive. [Filing No. 75 at 22.] PPINK points out that a "'physician's office' could begin performing abortions tomorrow, or at any other point in the future, and not be subject to the challenged statute." [Filing No. 75 at 23.] PPINK concludes that the statute's application to abortion clinics but not physician's offices performing the same procedure is irrational and, thus, violates PPINK's equal protection rights. [Filing No. 75 at 21.]

In its reply supporting its cross-motion, the State contends that the distinction at issue is rational because the legislature is concerned with regulating facilities that openly offer abortions, such as the Lafayette clinic, not physician's offices where "abortions are perhaps non-existent." [Filing No. 78 at 6.]

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws, which essentially is a direction that all persons similarly situated should be treated alike." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (citation omitted). "It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless the classification rests on grounds wholly irrelevant to the achievement of any legitimate governmental objective." *Harris v. McRae*, 448

U.S. 297, 322, 326 (1980) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)).  "All equal protection claims, regardless of the size of the disadvantaged class, are based on the principle that, under like circumstances and conditions, people must be treated alike, unless there is a rational reason for treating them differently."  *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010).

"[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014), *cert. denied*.  That said, even if the group discriminated against is not a suspect class, "courts examine, and sometimes reject, the rationale offered by government for the challenged discrimination."  *Id.*

It is undisputed that, as relevant to this claim, Indiana Code § 16-18-2-1.5 divides medical providers performing medication abortions into two groups—"abortion clinics" and "physician's offices"—and treats those groups differently.  Indiana Code § 16-18-2-1.5(a)(2) defines the term "abortion clinic" to include any freestanding entity that "provides an abortion inducing drug for the purpose of inducing an abortion."  But the statute excepts a "physician's office" from the definition of "abortion clinic," as long as abortion inducing drugs "are not the primarily dispensed or prescribed drug at the physician's office."  I.C. § 16-18-2-1.5(b)(3)(B).  The effect of this distinction is not meaningless.  A medication abortion provider deemed an "abortion clinic" must abide by the physical plant requirements that previously only applied to entities performing surgical abortions.  *See, e.g.*, 410 I.A.C. 26-17-2; 410 I.A.C. 26-17-2(d); 410 I.A.C. 26-13-3(b)(1).  But a medication abortion provider deemed a "physician's office" need not meet those physical plant requirements.  I.C. § 16-18-2-1.5(b)(3).  Unless there is a rational reason for treating medication abortion providers differently, the distinction created by Indiana Code § 16-18-2-1.5 violates the Equal Protection Clause.  *LaBella Winnetka*, 628 F.3d at 941.

The State's overarching argument is that it is rational not to equally regulate medication abortions provided at "physician's offices" because they either do not occur or are very rare and, thus, "do not pose the same risks" as medication abortions at other facilities. [Filing No. 74 at 12-13.] As support for this argument, the State submits an affidavit from Brian Carnes, the State Registrar of the IDOH. [Filing No. 73-1.] Mr. Carnes attests that a review of all Terminated Pregnancy Reports from July 1, 2006, through December 31, 2013, confirms that each form was submitted by a licensed abortion clinic, an ambulatory surgical center, a hospital, or PPINK's Lafayette clinic. [Filing No. 73-1 at 2.] Mr. Carnes infers from this data that no reported abortions occurred at a physician's office in Indiana during this time. [Filing No. 73-1 at 2.] Based on this evidence, the State contends that the legislature "had no need to regulate physicians' offices as abortion clinics" and, thus, the statute passes rational basis review. [Filing No. 74 at 12-14.]

The State's arguments ignore an undeniable statutory ambiguity between the terms "abortion clinic" and "physician's office" in Indiana Code § 16-18-2-1.5. Specifically, it is undisputed that the term "physician's office" is not defined in any relevant provisions. Under the plain text of the statute, the same entity is an "abortion clinic" if it prescribes any abortion inducing drugs, I.C. § 16-18-2-1.5(a)(2), but it also qualifies for the "physician's office" exception if abortion inducing drugs "are not the primarily dispensed or prescribed drug," I.C. § 16-18-2-1.5(b)(3)(B). The Lafayette clinic is a prime example of this ambiguity. It is undisputed that the Lafayette clinic prescribes abortion inducing drugs but that they are not the primarily dispensed or prescribed drug at that clinic. [Filing No. 71-1 (affidavit stating that 72 medication abortions and more than 7,000 other prescriptions (primarily contraceptives) were prescribed at the Lafayette clinic between July 1, 2013, and March 30, 2014).] Thus, pursuant to the plain text of the statute, the Lafayette clinic could either be an "abortion clinic" (because it "provides an abortion inducing

33

drug for the purpose of inducing an abortion," I.C. § 16-18-2-1.5(a)(2)), or qualify for the "physician's office" exception (because "abortion inducing drugs are not the primarily dispensed or prescribed drug at the physician's office," I.C. § 16-18-1.5(b)(3)(B)).[6]

This blatant ambiguity undermines the State's assertion that no physician's offices perform abortions, particularly since that term is undefined. It is undisputed that a "physician's office" with the same physical layout and amenities as the Lafayette clinic would not have to modify itself to comply with the physical plant requirements at issue because it would qualify for the "physician's office" exception in Indiana Code § 16-18-2-1.5(b)(3). In fact, the Lafayette clinic has a part-time physician, medication abortions are only offered when he is present, and the initial medication is administered from the physician's office. [Filing No. 26-2 at 2.] Thus, perhaps the Lafayette clinic is actually a "physician's office" performing medication abortions and, thus, not subject to the physical plant requirements at issue.[7] The State does not view it that way, but this is a prime example of how the ambiguity in the statute leads to arbitrary distinctions and unequal regulatory treatment with no rational basis.

---

[6] This distinguishes the case at bar from *Women's Medical Center of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001), which the State cites to support excluding physician's offices from abortion clinic regulations. [Filing No. 74 at 15.] The Texas statute at issue in *Bell* set a "300-abortion floor as an accommodation to private physicians who provide a number of abortions that the government considers to be too few to require licensing." 248 F.3d at 419. The Indiana statute sets no such floor and, again, does not define the term "physician's office." I.C. § 16-18-2-1.5.

[7] PPINK has never sought relief on the basis that it should actually be considered a "physician's office" not subject to the physical plant requirements at issue. The Court will not *sua sponte* afford a party relief that it has not requested. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. . . . Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). The Court notes this possibility, however, to further highlight the statute's ambiguity.

Not only is the statute ambiguous, it results in disparate treatment between an "abortion clinic" and the undefined "physician's office," which remains statutorily authorized to perform medication abortions without complying with the physical plant requirements. United States Supreme Court precedent confirms the State's ability to regulate abortion providers differently than those providing "*other*, and *comparable*, medical or surgical procedures." *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 80-81 (1976) (emphases added). It does not, however, authorize the unequal treatment of those providing the exact same procedure, without a rational basis, and equal protection demands otherwise. *See LaBella Winnetka*, 628 F.3d at 941 (holding that "regardless of the size of the disadvantaged class" equal protection requires that "under like circumstances and conditions, people must be treated alike, unless there is a rational reason for treating them differently"). The State's interests in maternal health, continuity of care, and the treatment of medical complications, if sincere, should apply equally regardless of whether an "abortion clinic" or a "physician's office" provides the medication abortion. And although the State argues that abortion clinics present a greater risk for it to regulate because they allegedly administer the procedure more frequently, [Filing No. 74 at 13], that argument is hard to square with its other argument that "physicians who operate their own practices are typically less regulated than other medical facilities." [Filing No. 74 at 14.]

The Court concludes that Indiana Code § 16-18-2-1.5(a)(2) violates the Equal Protection Clause as applied to the Lafayette clinic. It allows the State to arbitrarily divide medication abortion providers into two groups—"abortion clinics" and undefined "physician's offices"—and treat those groups differently, without a rational basis for doing so, by requiring "abortion clinics" but not "physician's offices" to meet the physical plant requirements at issue. The consequence is that the Lafayette must either comply with certain physical plant requirements that previously only

applied to surgical abortion providers, or stop providing medication abortions.[8]  No "physician's office" faces the same choice.  The Court concludes that PPINK is entitled to summary judgment as a matter of law on its equal protection claim regarding the application of Indiana Code § 16-18-2-1.5(a)(2) to its Lafayette clinic.

### 2)  Prohibition of Waiver for Abortion Clinics

PPINK also contends that Indiana Code § 16-21-2-2.5(b) violates the Equal Protection Clause to the extent that it prohibits the IDOH from waiving physical plant requirements for abortion clinics that would not harm patient safety.  [Filing No. 72 at 28-32.]  PPINK makes this challenge on behalf of its Lafayette clinic, which only provides medication abortions, as well as on behalf of its Indianapolis, Bloomington, and Merrillville clinics, which also provide surgical abortions.  [Filing No. 72 at 28-32; Filing No. 70.]  PPINK emphasizes that "existing Indiana law bars waivers that would harm patient safety, [so] the only waivers that the Act's new classification bars for abortion clinics are those that do not harm patient safety."  [Filing No. 72 at 29.]

In response, the State contends that the legislature "may require that all abortion clinics be minimally prepared to treat abortion complications surgically."  [Filing No. 74 at 17.]  It seizes on a statement in PPINK's brief conceding that requirements are "certainly rational" for providers of surgical abortions.  [Filing No. 74 at 17 (citing Filing No. 72 at 24).]  The State concludes that it "therefore must be true that the [IDOH's] inability to waive certain requirements for [PPINK's] surgical clinics is constitutional."  [Filing No. 74 at 17.]

---

[8] The IDOH interprets Indiana Code § 16-21-2-2.5(b) as prohibiting it from granting a waiver of the surgical physical plant requirements that the Lafayette clinic does not meet.  [Filing No. 50 at 2.]  In Indiana, "[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless [its] interpretation would be inconsistent with the statute itself."  *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000).  The constitutionality of that waiver prohibition will be addressed in the next subsection.

In reply, PPINK contends that the State has not articulated a specific rational concern about why abortion clinics cannot apply for a waiver while other entities that perform abortions can. [Filing No. 75 at 27-28.] Thus, PPINK concludes that the waiver prohibition violates its clinics' equal protection rights. [Filing No. 75 at 29.]

In its reply supporting its cross-motion, the State emphasizes that precedent confirms that it can treat abortion providers differently than other healthcare providers. [Filing No. 78 at 6-7.] Thus, it concludes that the waiver prohibition on abortion clinics is not unconstitutional. [Filing No. 78 at 7.]

Rules "pertaining to the operation and management of hospitals, ambulatory outpatient surgical centers, abortion clinics, and birthing centers" may be adopted as "necessary to protect the health, safety, rights, and welfare of patients." Indiana Code § 16-21-1-7. This includes "[r]ules establishing standards for equipment, facilities, and staffing required for efficient and quality care of patients." Indiana Code § 16-21-1-7. For "good cause shown," the IDOH previously had the discretion waive a rule for any of the above facilities, as long as the "waiver [did] not adversely affect the health, safety, and welfare of the residents or patients." Indiana Code § 16-21-1-9.

That discretion was curtailed when Indiana Code § 16-21-2-2.5(b) was amended to provide that the IDOH "may not exempt an abortion clinic from the requirements described in subsection (a) or the licensure requirements set forth in an administrative rule, including physical plant requirements." The definition of "abortion clinic," as detailed at length in the previous section, defines that term in relevant part to include a freestanding entity that "performs surgical abortion procedures" or "provides an abortion inducing drug for the purpose of inducing an abortion." I.C. § 16-18-2-1.5(a).

It is undisputed that the IDOH can waive rule requirements, including physical plant requirements for hospitals, ambulatory outpatient surgical centers, and birthing centers if the waiver does not "adversely affect the health, safety, and welfare of the residents or patients." Indiana Code § 16-21-1-9. It is likewise undisputed that until the legislature passed Indiana Code § 16-21-2-2.5(b), abortion clinics sought rule waivers under Indiana Code § 16-21-1-9, sometimes successfully. For example, in 2009, PPINK sought and obtained a waiver for an administrative rule requirement for its Merrillville clinic pursuant to Indiana Code § 16-21-1-9. [Filing No. 26-1 at 8-9 (IDOH "Order To Grant a Waiver" to Merrillville clinic (citing Indiana Code § 16-21-1-9)).] But abortion clinics can no longer obtain rule waivers pursuant to Indiana Code § 16-21-1-9 because of Indiana Code § 16-21-2-2.5(b), which expressly prohibits them for abortion clinics. [Filing No. 50 at 2.] PPINK asserts that with regard to its Merrillville clinic, for example, it would "like to be able to request permission from the [IDOH] to provide persons in the waiting area with either bottled water or a water cooler instead of installing a drinking fountain." [Filing No. 72 at 16; Filing No. 71-1 at 3.]

The Court has already detailed the Seventh Circuit's recent decision in *Van Hollen* at length. *See* Part III.A. One portion of that decision is particularly relevant to PPINK's equal protection challenge to Indiana Code § 16-21-2-2.5(b) and bears repeating. At issue in *Van Hollen* was the constitutionality of a statute prohibiting a doctor from performing an abortion unless the doctor had admitting privileges at a hospital no more than 30 miles from the clinic at which the abortion was performed. *Id.* at 787. *Van Hollen* expressly noted that "[a]n issue of equal protection of the laws [was] lurking" in the case because "the state seems indifferent to complications from non-hospital procedures other than surgical abortion (especially other gynecological procedures), even when they are more likely to produce complications." 738 F.3d at 790.

The abortion clinic rule waiver prohibition in Indiana Code § 16-21-2-2.5(b) presents an even more blatant issue of equal protection than the one lurking in *Van Hollen*. Here, the waiver prohibition expressly singles out "abortion clinics," despite the fact that the State's own evidence confirms that ambulatory surgical centers and hospitals also perform abortions. [Filing No. 73-1 at 2 (affidavit from State Registrar of the IDOH reviewing Terminated Pregnancy Reports from July 2006 through December 2013 and confirming that ambulatory surgical centers and hospitals perform abortions).] But ambulatory surgical centers and hospitals remain statutorily eligible to seek a rule waiver pursuant to Indiana Code § 16-21-1-9 because the abortion clinic waiver prohibition in Indiana Code § 16-21-2-2.5(b) does not apply to them.

The State presents no rational basis for this unequal treatment. As PPINK points out, the general waiver rule already prohibits granting any waiver that would "adversely affect the health, safety, and welfare of the residents or patients." Indiana Code § 16-21-1-9. Thus, the abortion clinic waiver prohibition in Indiana Code § 16-21-2-2.5(b) cannot be justified on grounds related to health of abortion clinic patients, as the State tries to do. [Filing No. 74 at 17.] The Court also rejects the State's argument that "the legislature may require that all abortion clinics be minimally prepared to treat abortion complications surgically," [Filing No. 74 at 17], because the waiver prohibition does not apply to all medical providers performing abortions. Instead, the statutory scheme at issue allows ambulatory surgical centers and hospitals to perform abortions and still obtain rule waivers that would not adversely affect the health of their patients. The abortion clinic waiver prohibition in Indiana Code § 16-21-2-2.5(b) specifically targets abortion providers that the State deems to be "abortion clinics" by prohibiting them from obtaining a rule waiver, even in

cases that will not adversely affect the health of the patients.[9]  Because the State has provided no

rational basis for this unequal treatment, the Court grants summary judgment in favor of PPINK

on its equal protection claim regarding Indiana Code § 16-21-2-2.5(b).[10]

## IV.
### CONCLUSION

For the reasons set forth herein, the Court **GRANTS IN PART** PPINK's Motion for

Summary Judgment, [Filing No. 71], to the extent that the Court enters summary judgment in favor

of PPINK on its claim that Indiana Code §§ 16-18-2-1.5(a)(2) and 16-21-2-2.5(b) violate the Equal

Protection Clause of the United States Constitution.  The Court **DENIES** PPINK's request for

summary judgment on the Fourteenth Amendment claim it brings on behalf of its patients' right

to choose an abortion and on PPINK's substantive due process claim.  The Court **DENIES** the

State's Motion for Summary Judgment in all respects.  [Filing No. 73.]  No final judgment shall

issue at this time.

PPINK's claims that remain pending seek injunctive relief regarding Indiana Code § 16-

18-2-1.5(a)(2), but PPINK is entitled to that relief by entry of summary judgment in its favor on

its equal protection claim.  Thus, the Court requests that the assigned Magistrate Judge schedule a

status conference with the parties to discuss the effect of the Court's summary judgment order on

the remaining pending claims, the necessity of the presently scheduled June 2015 trial, and the

---

[9] The Court recognizes that this is a different conclusion than it reached in denying PPINK's preliminary injunction request regarding Indiana Code § 16-21-2-2.5(b).  At that time, however, there was no evidence in the record that other entities, such as ambulatory surgical centers, were performing abortions and still able to obtain physical plant requirement waivers.  In other words, it was not clear to the Court at that time that Indiana Code § 16-21-2-2.5(b) resulted in unequal treatment based on whether the State classified an abortion provider as an "abortion clinic" or another type of abortion provider.

[10] Unlike PPINK's Fourteenth Amendment and substantive due process claims, its equal protection claim does not implicate disputed issues of fact, but instead is based on the undisputed interpretation and application of the statutes at issue.  Summary judgment is therefore appropriate.

contents of any proposed permanent injunction and final judgment if the parties deem trial to be unnecessary.

December 3, 2014

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF**:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Talcott Camp
AMERICAN CIVIL LIBERTIES UNION
tcamp@aclu.org

Heather Hagan McVeigh
OFFICE OF THE ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
tom.fisher@atg.in.gov

Ashley Tatman Harwel
OFFICE OF THE INDIANA ATTORNEY GENERAL
ashley.harwel@atg.in.gov

Helene T. Krasnoff
PLANNED PARENTHOOD FEDERATION OF AMERICA
helene.krasnoff@ppfa.org